[No. B213985. Second Dist., Div. Eight. Aug. 4, 2010.]

MRI HEALTHCARE CENTER OF GLENDALE, INC., Plaintiff and Appellant, v.
STATE FARM GENERAL INSURANCE COMPANY, Defendant and Respondent.

**COUNSEL**

Donahue & Horrow, Michael B. Horrow; Douglas A. Greer; and Alan S. Yockelson for Plaintiff and Appellant.

Chapman, Popik & White, Susan M. Popik; Sedgwick Detert Moran & Arnold and Maria Louise Cousineau for Defendant and Respondent.

**OPINION**

**FLIER, J.**—MRI Healthcare Center of Glendale, Inc. (MHC), appeals from a judgment entered by the superior court after it denied MHC's motion for summary judgment and granted respondent State Farm General Insurance Company's (State Farm) cross-motion for summary judgment. The action arises from State Farm's denial of MHC's claim under a business insurance

policy for loss as a result of claimed damage to its MRI (magnetic resonance imaging) machine and loss of income after the machine failed to satisfactorily "ramp up" after it was "ramped down."

MHC asserts triable issues of fact precluded the grant of summary judgment to State Farm and MHC is entitled to summary judgment because State Farm has no defense against MHC's claims. State Farm contends (1) the undisputed facts establish that the MRI machine did not sustain "physical loss," nor was the alleged loss the result of an "accident"; (2) rainstorms MHC contends were the predominant cause of the loss were not a legally cognizable cause of the claimed loss; and (3) all potential causes of MHC's loss are specifically excluded under the policy. We affirm.

## FACTS

### 1. *The Parties*

MHC provided MRI scanning services as its sole business. State Farm issued MHC a business policy, effective June 1, 2006, to June 1, 2007. The policy was also in effect during the two prior policy years. The policy provided insurance coverage for business liability, business personal property and loss of income.

### 2. *Factual Background*

MHC contends, and State Farm concedes for the limited purpose of appeal, that the facts are as follows. As a result of storms in the spring of 2005, MHC's landlord was required to repair the roof over the room housing MHC's MRI machine. These repairs could not be undertaken unless and until the MRI machine was demagnetized, or "ramped down." Once the machine was ramped down, it failed to ramp back up. This failure purportedly constituted "damage" to the MRI machine and resulted in loss of business income to MHC. Because the chain of events was set in motion by the spring 2005 storms, MHC claims the storms were the "efficient proximate cause" of the loss; and, because the storms were covered under the business policy issued to MHC by State Farm, MHC claims it is entitled to recover both the amount it expended to repair the MRI machine and the income loss sustained while the machine was inoperable.

### 3. *Policy Terms*

The business policy State Farm issued to MHC provides, in "SECTION I [¶] PROPERTY COVERAGES," "COVERAGE B—[¶] BUSINESS PER-SONAL [¶] PROPERTY" (boldface omitted): "When a limit of insurance is

shown in the Declarations for Coverage B, we will pay for *accidental direct physical loss* to business personal property at the premises described in the Declarations caused by an *insured loss*. Business personal property includes the following types of property located in or on the buildings at the described premises . . . : [¶] 1. property, used in your business, that you own, lease from others or rent from others, or that is loaned to you; [¶] . . . [¶] 3. tenant's improvements and betterments, meaning fixtures, alterations, installations or additions: [¶] a. made a part of the building or structure you occupy but do not own; and [¶] b. you acquired or made at your expense but cannot legally remove." (Italics added.)

"COVERAGE C—LOSS OF INCOME" (boldface omitted) under the policy provides: "If Loss of Income coverage is shown in the Declarations, we will pay: [¶] 1. for the actual loss of 'business income' you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'. The suspension must be caused by *accidental direct physical loss to property* at the described premises, including personal property in the open . . . within 100 feet, caused by an *insured loss* . . . ." (Italics added.)

Paragraph 3 of the policy, under "LOSSES NOT INSURED" (boldface omitted), further states: "We do not insure under any coverage for any loss caused by one or more of the items below: [¶] a. conduct, acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body whether intentional, wrongful, negligent or without fault; [¶] b. faulty, inadequate, unsound or defective: [¶] (1) planning, zoning, development, surveying, siting; [¶] (2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; [¶] (3) materials used in repair, construction, renovation or remodeling; or [¶] (4) maintenance; [¶] of part or all of any property (including land, structures or improvements of any kind) on or off the described premises; [¶] c. weather conditions. [¶] But if *accidental direct physical loss* results from items 3.a., 3.b. or 3.c., we will pay for that resulting loss unless the resulting loss is itself one of the losses not insured in this Section."

Paragraph 4 of the policy, under "LOSSES NOT INSURED" (boldface omitted) states that "[w]e do not insure under any coverage for any loss consisting of the items in paragraphs 1., 2. or 3. This exclusion does not apply if the loss is caused by a peril which is not otherwise excluded."

## PROCEDURAL HISTORY

### 1. *Allegations of Complaint*

In August 2007, MHC filed the present action against State Farm for breach of the duty of good faith and fair dealing and breach of contract.

Among other things, the complaint alleges that "once an MRI [machine] is shut down, the process of 'ramping' it back up is unpredictable." The complaint further alleges that an engineer's report made before the MRI machine was shut down warned of a risk that ramping the MRI machine up after it has been ramped down could be "difficult if not impossible" due to the "inherent nature" of the MRI machine and "the length of time that the magnet ha[s] been ramped (14 years)." MHC alleges that repairs to the MRI machine began on August 23, 2006, they were completed on October 20, 2006, and the MRI machine was eventually successfully ramped up again by mid-December 2006. MHC alleges State Farm denied MHC's first party claim for business interruption insurance, property damage and loss of business income and MHC was thus damaged.

State Farm answered the complaint in October 2007.

## 2. Cross-motions for Summary Judgment

### A. MHC's Motion

In August 2008, MHC filed a motion for summary judgment or, in the alternative, summary adjudication (summary judgment), asserting that no triable issue of fact existed as to MHC's causes of action for breach of contract and breach of the covenant of good faith and fair dealing, and MHC was entitled to judgment as a matter of law.

### Evidence in Support of Motion

MHC attached declarations, including that of the building owner's managing agent who stated that the building's roof was severely damaged from storms in 2005 and it was necessary to remove and replace the roof of the entire building with a new one. The agent stated that he accepted a proposal to tear off the existing "built up" roof and replace it with a "torch down" roof system; the initial plans called for all layers of the existing roof to be removed and all existing skylights, including a skylight that formed part of the roof above the MRI machine, to be raised onto "2X blocking."

An MRI machine specialist working for Masterplan attested that he serviced the machine and participated in the ramping down and ramping up of the machine. He stated the nature of the MRI machine required it to be kept in an "RF" room shielded with copper to keep out electrical or radio wave interference. MHC's facility was designed and constructed so that the roof of the building was part of the ceiling of the RF room. In order to remove the old roof and install a new roof safely, it was necessary to "ramp down" or demagnetize the MRI machine. The Masterplan specialist stated

that "[t]he age of the equipment led to a costly repair" and that "[p]arts required were external to the magnet and required by the specialized *test equipment* used by this magnet." (Italics added.) He declared, "the machine, which had been working properly prior to the ramp down, required extensive maintenance to be brought back to an operating condition."

## B. *State Farm's Motion*

State Farm filed a cross-motion for summary judgment. Rather than a judgment in MHC's favor, State Farm requested that judgment be entered in State Farm's favor. The insurer contended that any loss MHC suffered from the ramping down of its MRI machine was not a loss payable under the State Farm business policy. It argued there was never any "accidental direct physical loss" to MHC's property or to the premises; therefore, there was no loss payable under the first party business policy.

### i. *Evidence in Support of Motion*

State Farm proffered evidence of the following facts that were essentially undisputed by MHC.

MHC's principal, Christina Valenzuela, reported to State Farm that a rainstorm in March 2005 had caused extensive damage to the roof which the landlord was repairing. Years earlier, MHC had renovated and customized its portion of the building so it could install and operate the MRI machine. MHC had cut a hole in the roof of the building in order to bring the MRI machine into the building, and it also modified the roof structure by installing a skylight and copper barrier to keep outside electrical or radio wave interference out of the MRI room. Under the terms of its lease, MHC was required to maintain the leased premises, including the skylight it installed as well as the ventilating and air conditioning systems.

In June 2005, the landlord's agent hired a roofing company to replace the roof. In August 2005, however, the managing agent notified MHC that "after removal of the old roofing materials from [MHC's] modification of the rear roof area . . . , the roofing Company discovered that due to faulty installation of skylights and roofing materials that [MHC] installed as tenant improvements . . . , numerous wooden structures and other improvements were damaged by water leakage causing rotting and mold." MHC's insurance agent therefore made a claim in August 2005 under its business policy to State Farm for "damage to wood and copper around skylight in MRI room."[1] (Capitalization & italics omitted.)

---

[1] State Farm accepted this claim and ultimately paid MHC's landlord more than $150,000 for repair of the roof structure at the skylight under the third party liability provisions of MHC's business policy.

In August 2005, Ms. Valenzuela informed State Farm that the landlord was repairing the roof, which had been damaged in a March 2005 rainstorm, but he could not continue with the repairs because of the unique requirements of the MRI room. She told State Farm's representative MHC was not making any claim for damage to the interior of the building or to the MRI unit, since there was no damage to either. However, she stated there might be a claim for future business loss if repairs were needed in the area where the MRI machine was located.

MHC's insurance agent later gave State Farm notice that "when the MRI machine is 'ramped down' for the construction, there is a high possibility/probability that the machine will not 'ramp back up' to function properly."[2]

State Farm notified Ms. Valenzuela orally and in writing on several occasions, including in letters of October 26, 2005, and May 15, 2006, that if MHC suffered a future loss of income or if the MRI machine sustained any damage from the loss, "we will not be able to extend coverage" under the business policy.[3] State Farm informed Ms. Valenzuela that the third party liability section of the business policy (under which State Farm paid the landlord's claims) provided no coverage for MHC's own property, and, if MHC suffered any future loss of income from the ramping down process, the loss would be excluded under the first party part of the policy.

MHC nevertheless proceeded to ramp down the MRI machine on August 23, 2006. A subsequent attempt to ramp up the machine was unsuccessful. In October 2006, MHC made a separate claim to State Farm for the ramp down of the MRI machine. The claim stated: "The insured was 'forced' to ramp

---

[2] Ms. Valenzuela testified at deposition that she had to sign a release of liability for the engineers before they did the ramp down because "[t]he likelihood of it not coming back up was quite great." She testified they wanted her to understand that "[i]t may not come up at all, and that's it. It's over."

[3] State Farm stated its understanding that MHC was making a claim for water damage as a result of a leak in the roof that occurred in March 2005, and the leak was adjacent to an area at which MHC made alterations. State Farm's October 26, 2005 letter stated its investigation revealed that, rather than any covered accidental direct physical loss, the cause of the leak was due to "wear, tear, deterioration and faulty workmanship," for which there was no first party coverage under the business policy. The May 15, 2006 letter referred MHC to the prior letter for "applicable policy exclusions and conditions" and reiterated the denial of coverage "for your business property or loss of income due to the loss not being caused by an insured loss." State Farm's May 2006 letter stated, "if you do sustain any damage from this loss, we will not be able to extend coverage" and "[a]ll policy provisions, exclusions and conditions in the previous correspondence still apply."

down their MRI unit by the property manager. The MRI unit is now damaged as a result."[4] (Capitalization & italics omitted.)

In December 2006, the State Farm representative, with the approval of MHC, spoke with the MRI machine specialist who ramped down the MRI machine and was informed that, by using a different combination of wires in the unit, the specialist ultimately was able to "open the superconductive switches," to ramp up the MRI machine. The MRI specialist further informed the State Farm representative that the nature of an MRI machine was such that, anytime an MRI machine is ramped down, there is an "inherent risk" it cannot be ramped up again.

ii. *Admissions*

State Farm proffered Ms. Valenzuela's deposition testimony as admissions made by MHC. In her deposition, Ms. Valenzuela admitted that the building's roof originally was to be repaired "from the front to the back" without removing the roof. She understood the roof would not be completely torn off and replaced; a new layer would simply be put on the whole roof to eliminate any further water intrusion. Ms. Valenzuela admitted that before August 2005 there was no indication roof repairs would have any impact on the MRI machine. It was only after the roofers found additional damage or deterioration of the roof above the MRI machine that she had to get Masterplan involved. She testified the ramping down of the machine came about as a result of the repairs that had to be made to the roof immediately above the MRI room.

C. *Substitution of Judge and Ruling*

The cross-motions for summary judgment were set to be heard on October 28, 2008, before Judge Judith Chirlin. Because of a health-related emergency the day before the hearing, Judge Chirlin could not preside, and Judge Rex Heeseman heard the motions in Judge Chirlin's place.

Judge Heeseman began the hearing with disclosures to the parties regarding his professional background and concluded they did not call for recusal.

---

[4] In November 2006, MHC's counsel provided State Farm with the MRI specialist's written assessment stating that "[d]ue to the length of time this magnet has been ramped (at field >14 years) the possibility exists that major damage / failure can occur." Ms. Valenzuela testified at deposition that the "damage" MHC incurred consisted of the MRI machine "being forced . . . to be ramped down."

He then indicated he would not rule on the numerous (138) objections to evidence, as neither party had complied with California Rules of Court, rule 3.1354.[5]

As to the merits, the court stated MHC could not establish there was an "accidental direct physical loss," as required for coverage under the policy, and it rejected MHC's contention the "efficient proximate cause" theory applied to this case. (See *Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 403 [257 Cal.Rptr. 292, 770 P.2d 704] (*Garvey*) [when loss to insured's property can be attributed to two separate or distinct perils, one a nonexcluded peril and the other an excluded peril, each of which could have caused the loss independently, claim is covered if nonexcluded peril is "efficient proximate" or "predominating" cause of loss even if excluded peril may have contributed to loss].) Moreover, although "roof issues" started some of the events, the court concluded the ramping down of the MRI machine, not the storms, in any case was the "predominant cause" of MHC's loss. The evidence showed the ramping down was not "an accident," but rather was done "purposefully." The court therefore granted State Farm's motion for summary judgment and denied MHC's motion.

The court filed an order regarding the cross-motions for summary judgment and entered judgment the same date. This timely appeal ensued.

## CONTENTIONS

MHC contends the trial court erred by granting State Farm's motion for summary judgment notwithstanding there were numerous triable issues of material fact. It argues that the trial court focused on the "wrong" event as the "proximate or efficient" cause of damage to the MRI machine, and erred in finding such damage was not accidental. MHC further asserts the court erred in failing to recognize that the policy granted first party property coverage for accidental direct physical damage resulting from certain causes of loss otherwise excluded. Finally, MHC contends the court erred in denying its motion for summary judgment.

## STANDARD OF REVIEW

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25

---

[5] Because we rely on the essentially undisputed facts, we do not address whether the trial court should have ruled on the parties' objections to evidence or the admissibility of objected-to evidence.

Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) "Once the [movant] has met that burden, the burden shifts to the [party opposing the motion] to show that a triable issue of one or more material facts exists as to that cause of action . . . ." (Code Civ. Proc., § 437c, subd. (p)(1) & (2); see also *Aguilar, supra*, 25 Cal.4th at p. 850.) A triable issue of material fact exists when "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra*, at p. 850.) When a summary judgment has been granted, we review the trial court's decision de novo, "considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].) An opposition to a summary judgment will be "deemed insufficient when it is essentially conclusionary, argumentative or based on conjecture and speculation." (*Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 11 [130 Cal.Rptr.2d 263].)

■ Insurance contracts are to be interpreted de novo in the same manner as any other contract, giving effect to the mutual intention of the parties. (*Fireman's Fund Ins. Cos. v. Atlantic Richfield Co.* (2001) 94 Cal.App.4th 842, 847 [115 Cal.Rptr.2d 26]; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619] (*Waller*).) We infer this intent solely from the written provisions of the insurance policy if possible. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) If the policy language "is clear and explicit, it governs." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) ■ When an issue of coverage exists, the burden is on the insured to prove facts establishing that the claimed loss falls within the coverage provided by the policy's insuring clause. (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1188 [77 Cal.Rptr.2d 537, 959 P.2d 1213] (*Aydin*); *Royal Globe Ins. Co. v. Whitaker* (1986) 181 Cal.App.3d 532, 537 [226 Cal.Rptr. 435].) Once the insured has made that showing, the burden is on the insurer to prove the claim is specifically excluded. (*Garvey, supra*, 48 Cal.3d at p. 406.)

## DISCUSSION

### 1. *Policy Coverage*

■ The fundamental precondition to coverage under the policy's first party coverage is "accidental direct physical loss" to insured property. That is, in order to recover, MHC had to sustain either or both (1) an "accidental direct physical loss" to its improvements or to the MRI machine (Coverage B)

or (2) a loss of business income due to the "necessary suspension" of its operations caused by "accidental direct physical loss" to its property (Coverage C). The accidental direct physical loss requirement is part of the policy's insuring clause and accordingly falls within MHC's burden of proof. (*Aydin, supra*, 18 Cal.4th at p. 1188; *Garvey, supra*, 48 Cal.3d at p. 406.) State Farm argues that the undisputed facts establish that MHC will be unable to meet this threshold burden because (1) although the MRI machine may have malfunctioned after being ramped down, it did not suffer any "physical loss"; and (2) even if the malfunction could be characterized as "physical loss," it was not "accidental." We agree. As the trial court correctly found, MHC's claimed loss does not fall within the policy's insuring clause.

## A. *"Physical Loss"*

In its opening brief, MHC states that "[t]he machine was damaged *by the ramp down—ramp up procedure.*" (Italics added.) As Ms. Valenzuela admitted, the only purported "damage" the MRI machine sustained was its failure to ramp up after it was ramped down, including various repairs and adjustments associated with the ramp-up attempts. At deposition, in response to a question asking whether, "prior to the ramp-down process, there wasn't any physical damage to the MRI machine?" she responded, "No, not that I recall."

MHC's brief asserts: "[T]he ramping down of the machine had a significant physical impact on the machine. It was almost impossible to ramp it back up and costly repairs had to be made. . . . Physical changes had to be made to the machine to get it to work. . . . [¶] . . . Further, the machine never worked *as well as it did before the ramp down.* . . ." (Italics omitted & added.)

The policy at issue does not define "direct physical loss." However, property insurance is a type of insurance with its own historical development. "Historically, property insurance grew out of the insurance against the risk of fire which became available for ships, buildings, and some commercial property at a time when most of the structures in use were made wholly or primarily of wood. Modern property insurance continues to offer protection against fire, but has also undergone considerable expansion. The concept of 'property insurance' now includes a broad spectrum of policies and coverages applicable to just about any type of property that exists in the modern world." (10A Couch on Insurance (3d ed. 2005) § 148:1, p. 148-8.) Coverage under property insurance is " 'triggered' by some threshold concept of injury to the insured property." (*Id.*, § 148:46, p. 148-80.)

In modern policies, " 'physical loss or damage' " is typically the trigger for coverage. (10A Couch on Insurance, *supra*, § 148:46, p. 148-80.) Clearly, this

threshold is met when an item of tangible property has been "physically altered" by perils such as fire or water. (*Ibid.*) However, serious questions crop up in instances when the structure of the property itself is unchanged to the naked eye and the insured claims its usefulness for its normal purposes has been destroyed or reduced. (*Ibid.*) That the loss needs to be "physical," given the ordinary meaning of the term, is "widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property."[6] (Couch on Insurance, at p. 148-81, fns. omitted.)

A direct physical loss "contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so." (*AFLAC Inc. v. Chubb & Sons, Inc.* (2003) 260 Ga.App. 306 [581 S.E.2d 317, 319] [remediation costs of converting computer systems from two-digit to four-digit date recognition capability not a covered risk under all-risk property insurance].) The word "direct" used in conjunction with the word "physical" indicates the change in the insured property must occur by the action of the fortuitous event triggering coverage. In this sense, "direct" means " '[w]ithout intervening persons, conditions, or agencies; immediate.' [Citation.]" (*Ibid.*) For loss to be covered, there must be a "distinct, demonstrable, physical alteration" of the property. (10A Couch on Insurance, *supra*, § 148:46, p. 148-81.)

In this case, there was no "distinct, demonstrable [or] physical alteration" of the MRI machine. Under the undisputed evidence presented, the 2005 storms resulted in the landlord's decision to repair the roof of the building to prevent water incursion. Ms. Valenzuela admitted that the original repair contemplated only a reroofing of the surface "from the front to the back" without actual removal of the roof, with no impact upon the MRI machine. It was only after the roofers found structural damage to the roof immediately above the MRI machine, due to MHC's purported negligence in installing and maintaining the skylight, that it was decided the roof had to be removed

---

[6] We note that the cause of loss in the context of property insurance is wholly different from that in a liability policy. In liability insurance, unlike in property insurance, the right to coverage for third party liability depends on traditional tort concepts of fault, proximate cause and duty. Property insurance, on the other hand, depends upon the relationship between perils that are either covered or excluded in the insurance contract. In third party insurance, by agreeing to cover the insured for personal liability, including liability for the insured's own negligence, the insurer agrees to cover the insured for a "broader spectrum of risks" than in property insurance. (*Garvey, supra*, 48 Cal.3d at pp. 406–407.)

and the MRI machine ramped down. Any damage suffered by the MRI machine in 2006 was not directly attributable to the 2005 storms.

The failure of the MRI machine to satisfactorily "ramp up" emanated from the inherent nature of the machine itself rather than actual physical "damage." As State Farm suggests, the MRI machine was not "damaged" in the ordinary meaning of the word. In effect, the machine was turned off and could not be turned back on. This does not constitute a compensable "direct physical loss" under the policy. (*Pirie v. Federal Ins. Co.* (1998) 45 Mass.App.Ct. 907 [696 N.E.2d 553, 555] [internal defect in a building, such as bad title or bad paint, "does not rise to the level of a physical loss"].)

For there to be a "loss" within the meaning of the policy, some *external force* must have acted upon the insured property to cause a *physical change* in the condition of the property, i.e., it must have been "damaged" within the common understanding of that term. (See *Ward General Ins. Services, Inc. v. Employers Fire Ins. Co.* (2003) 114 Cal.App.4th 548, 556–557 [7 Cal.Rptr.3d 844] [loss of stored database when system "crashed" with consequent economic loss was not " 'direct physical loss' " covered under policy]; *State Farm Fire & Casualty Co. v. Superior Court* (1989) 215 Cal.App.3d 1435, 1445 [264 Cal.Rptr. 269] ["Neither diminution in value nor the cost of repair or replacement are active physical forces—they are not the cause of the damage . . . [but] the measure of the loss or damage."].)

Although the MRI engineering specialist who performed the work on the MRI machine stated that extra parts were required when he ramped up the machine, he also stated that the extra parts were needed for the specialized *test equipment* used and the extra parts were "external" to the magnet itself. He also informed the investigating State Farm representative, who spoke with the specialist with MHC's permission, that the MRI machine ultimately was ramped up merely by using a "different combination" of wires in the unit to "open the superconductive switches" in the machine.

MHC therefore failed to show any "physical loss" occurred to the MRI machine. As we further discuss, a deliberate decision to ramp down the MRI machine is also not the type of fortuity contemplated by property insurance.

B.  *"Accidental"*

■ The concept underlying property insurance rests on fortuity. (10A Couch on Insurance, *supra*, § 148:46, p. 148-83.) "Essentially, insurance is a contract by which one party (the insurer), for a consideration . . . , promises to make a certain payment . . . upon the destruction or injury of 'something' in which the other party (the insured) has an interest." (1 Couch on Insurance

(3d rev. ed. 2009) § 1:6, p. 1-16.) A common definition of "insurance," of which the present policy is a case in point, is a "contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an unknown or contingent event." (*Id.*, at p. 1-18.) The type of perils or risks insured against in property insurance contemplates " 'fortuitous, active, physical forces such as lightning, wind, and explosion, which bring about the loss.' " (*Garvey, supra*, 48 Cal.3d at p. 406.)

■ The undisputed evidence conclusively established the ramping down of the MRI machine was not "accidental" within the meaning of the policy but rather the deliberate and intentional act of MHC. "Accidental" in an insurance policy typically means "unintended and unexpected by the insured." (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1249 [37 Cal.Rptr.3d 918]; see *St. Paul Fire & Marine Ins. Co. v. Superior Court* (1984) 161 Cal.App.3d 1199, 1202 [208 Cal.Rptr. 5] [" 'accidental' means 'arising from extrinsic causes[; . . .] occurring unexpectedly or by chance[; or] happening without intent or through carelessness' " (fn. omitted); thus, "purposeful" conduct was not "an unintentional, unexpected, chance occurrence" under policy].) Accordingly, "[a]n accident . . . is never present when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage." (*Merced Mutual Ins. Co. v. Mendez* (1989) 213 Cal.App.3d 41, 50 [261 Cal.Rptr. 273].) Moreover, "an injury-producing event is not an 'accident' within the policy's coverage language when all of the acts, the manner in which they were done, and the objective accomplished occurred as intended by the actor." (*Delgado v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302, 311–312 [97 Cal.Rptr.3d 298, 211 P.3d 1083].)

The ramping down of the MRI machine in this case was intentional, and the machine's failure to ramp back up was an expected, although unwelcome, result of the ramp down. It was undisputed that MHC's insurance agent informed State Farm in April 2006, months before the MRI machine was ramped down, of the "high possibility/probability" the machine would not ramp back up if it was ramped down. Ms. Valenzuela testified, as one of the owners of MHC, that she was warned by the engineers of those "dangers" prior to the machine being ramped down. She acknowledged it was a "very high-tech" machine. In October 2005, she notified State Farm of the potential loss of business income and potential damage to the MRI machine that could result from the ramp down/ramp up procedure. The claimed damage to the machine, together with the loss of business income stemming from the inability to operate the machine, was therefore not unexpected, unintended or unforeseen. In short, the loss was not "accidental" within the meaning of the policy.

The trial court concluded that MHC could not show an "accidental direct physical loss" to property within the coverage of the policy. The court noted that prior to the machine's being ramped down in August 2006, "there was contact, notification, whatever word you want to use between the landlord and [MHC] and between [State Farm] and [MHC] about the difficulties of ramping down an MRI and who was not going to be responsible. . . . [T]he May '06 letter from [State Farm] to [MHC], in effect, denies coverage for the first party claim . . . ." Under the evidence presented in this record, the court did not err in determining State Farm was entitled to a judgment as a matter of law because MHC did not suffer an "accidental direct physical loss" under Coverage B or Coverage C.

### 2. Other Contentions

MHC makes other contentions regarding its loss, none of which is meritorious.

MHC contends the 2005 storms were the "efficient proximate cause" of its loss and, because the storms were not excluded from the policy coverage, the loss was covered under the policy. MHC argues that under *Garvey, supra*, 48 Cal.3d 395, 406, "if the storm damage set other contributing causes of the loss (i.e., the ramp down) in motion, it would be the 'efficient' proximate cause" and "[c]learly, . . . it was the storm damage in 2005 that set the loss in motion." We disagree.

■ *Garvey* explained that the "efficient proximate cause standard" comes into play in determining whether coverage exists when both excluded and covered perils *interact* to cause a loss. (*Garvey, supra*, 48 Cal.3d at p. 401, italics omitted.) The Supreme Court in *Garvey* clarified the meaning of " 'efficient proximate cause,' " noting appellate courts in the past had equated that term with " 'moving cause,' " which could be misconstrued if taken literally to mean the " 'triggering' " cause. (*Id.* at p. 403.) MHC's contention that it was the storm damage in 2005 that "set the loss in motion" does not win the day. The "efficient proximate cause," as *Garvey* noted, must be the "predominating" cause. (*Ibid.*) Even if the storm damage set in motion the course of events leading to the ramp down of the MRI machine, it ultimately was the ramping down itself that was the sole, and predominating, cause of MHC's loss. (*Penn-America Ins. Co. v. Mike's Tailoring* (2005) 125 Cal.App.4th 884, 891–892 [22 Cal.Rptr.3d 918] ["efficient proximate cause" analysis not applicable when loss results from single cause, even if susceptible to various characterizations; loss caused by overflow of water and sewage resulting from clogged sewer line beneath insured's property had only one cause, backup of water in sewer cleanout pipe, "regardless of what may have initiated the obstruction of the sewer beneath Mike's basement"];

*Pieper v. Commercial Underwriters Ins. Co.* (1997) 59 Cal.App.4th 1008, 1018–1021 [69 Cal.Rptr.2d 551] [when brush fire, a noncovered cause, started by arson, a covered cause, destroyed insured's mask collection, there was only one cause of loss—the brush fire; efficient proximate cause theory inapplicable].)

The storms of 2005, moreover, were not the cause of the chain of events leading to the ramping down of the MRI machine. Ms. Valenzuela admitted that the original work prompted by the storms contemplated only placing a layer over the existing roof structure having no impact upon the MRI machine. It was only when the roofer discovered dry rot and decay from long-term water intrusion (a noncovered risk) immediately above the MRI machine that it became necessary to make structural repairs affecting its operation.

MHC further makes the point that even though there are several exclusions in the policy for varying types of water damage, there is no exclusion for damage from rain. It asserts the policy additionally covers damages from "windstorm" and includes an exception to exclusion for damage to the interior of the building when, for example, a covered cause of loss such as wind causes an opening in the roof through which rain enters. However, no evidence was presented that the MRI machine or any other covered property was damaged as a result of windstorm or rain. In fact, Ms. Valenzuela repeatedly denied that MHC's property sustained such damage. Neither the State Farm representative nor the structural engineer or licensed contractor State Farm retained to inspect the roof found evidence of wind or storm damage.

MHC additionally claims coverage was available for damage caused by negligent construction of the tenant improvements it made to the ceiling above the MRI machine in the roof structure when it first moved into the premises. Although State Farm denied coverage for such damage under an exclusion for negligent construction, MHC asserts an exception to that exclusion exists when accidental direct physical loss results in damage to other property such as the MRI machine. However, as State Farm points out, the exception to the exclusion still conditions coverage on the existence of "accidental direct physical loss," which MHC has the burden to prove and which it has not proved. (*Aydin, supra,* 18 Cal.4th at p. 1188.) A similar problem arises as to MHC's argument that even if the cause of the damage to the MRI machine was an intentional decision "to make the roofing repairs," the decision resulted in accidental direct loss to the MRI machine. Damage to the machine was not "accidental" in that MHC fully knew of and expected such a risk before ramping down the machine. Much the same problem obtains for MHC's argument that its claim is subject to an exception to the

exclusion for "wear, tear, rust, corrosion, decay, deterioration" and the like. There still must be an accidental direct physical loss for coverage.[7] As the Supreme Court has noted, "if the insurer is expected to cover claims that are outside the scope of the first party property loss policy, an 'all risk' policy would become an 'all loss' policy." (*Garvey, supra*, 48 Cal.3d at p. 408.)

For all of the above reasons, the trial court properly granted summary judgment to State Farm.

### 3. *MHC's Motion for Summary Judgment*

The same reasons that support the court's grant of State Farm's motion for summary judgment support the denial of MHC's motion for summary judgment. With respect to MHC's claim for breach of the implied covenant of good faith and fair dealing, there can be no breach of that duty unless policy benefits are due under the contract. (*Waller, supra*, 11 Cal.4th at p. 35; *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1151–1153 [271 Cal.Rptr. 246] (*Love*).) The " 'conclusion that a bad faith claim cannot be maintained unless policy benefits are due is in accord with the policy in which the duty of good faith is [firmly] rooted.' " (*Waller*, at p. 36; see also *Love*, at p. 1153.) That guiding principle is based on general contract law and the well-entrenched rule " ' "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." ' " (*Waller*, at p. 36.) As *Love* explained, "when benefits are due an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because it frustrates the insured's *primary* right to receive the benefits of his contract—i.e., prompt compensation for losses. Absent that primary right, however, the *auxiliary* implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings." (*Love*, at p. 1153.) And when there is a genuine issue regarding the insurer's liability under the policy for the claim asserted by the insured, as here there was, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute. (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347 [108 Cal.Rptr.2d 776].) Whether the insurer has acted in bad faith may be decided as a matter of law in a proper case as the one at hand. (*Id.* at pp. 347–348.)

---

[7] MHC further claims a fire occurred in the ramp up process and fire is a specified cause of loss under the policy triggering coverage. MHC never filed a claim with State Farm for fire damage and nothing in the record establishes such a fire occurred. The sole reference to any fire was a notation in a Masterplan invoice of "a strong burnt electrical smell" during a single service visit.

MHC accordingly has no basis to maintain a claim for breach of the covenant of good faith. Lacking such a claim, there is no basis for an award of punitive damages.

## DISPOSITION

The judgment is affirmed. State Farm is to recover costs on appeal.

Bigelow, P. J., and Rubin, J., concurred.