[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-12887
_____

D.C. Docket No. 1:17-cv-23362-KMM


MAMA JO'S INC.,
d.b.a. Berries,

Plaintiff - Appellant,

versus

SPARTA INSURANCE COMPANY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 18, 2020)

Before NEWSOM, TJOFLAT, Circuit Judges, and PROCTOR,* District Judge.

_____

* Honorable R. David Proctor, United States District Judge for the Northern District of
Alabama, sitting by designation.

PROCTOR, District Judge:

In this insurance coverage case, we are called upon to assess whether the district court properly excluded the opinions of Plaintiff's experts and granted Defendant's motion for summary judgment based upon the conclusion that Plaintiff failed to establish that it suffered a direct physical loss that would trigger coverage. We conclude the district court correctly ruled on both questions. Therefore, for the reasons more fully discussed below, we affirm.

I.    Background

Appellant Mama Jo's Inc. d/b/a Berries ("Berries") owns and operates a restaurant located at 2884 SW 27th Avenue, Miami, FL 33133. (Doc. 107-1 at 8-9). The restaurant is located less than one mile from the ocean (Doc. 111-5 at 4; Doc. 111-6 at 57-58, 104), and is partially enclosed by a retractable awning, wall, and roof system. (Doc. 109-4 at 4, 31; Doc. 109-5 at 66-68, 75-81; Doc. 110-8 at 104). When the system is opened, the restaurant's interior areas are exposed to the elements. (Id.). The restaurant's front entrance, bar, and seating areas are adjacent to SW 27th Avenue. (Doc. 107-1 at 95-97; Doc. 109-5 at 51-54, 66-71, 80; Doc. 116-8 at 4-5).

A.    The Road Construction

From December 2013 until June 2015, there was roadway construction at different locations along SW 27th Avenue in the general vicinity of the restaurant.

2

(Doc. 102 at 2; Doc. 107-1 at 58-60; Doc. 116-5 at 11). During that time, dust and debris generated by the construction migrated into the restaurant. (Doc. 116 at 3-5; Doc. 110-3 at 51-55; Doc. 110-8 at 54; Doc. 116-8 at 3-7; Doc. 116-9 at 3-15, 19-29). Berries performed daily cleaning using its normal cleaning methods, employing dust pans, hoses, rags, towels, and blowers. (Id.).

Berries was open every day throughout the time period of the roadwork. (Doc. 116 at 3-5; Doc. 110-8 at 56-57, 95-97; Doc. 116-8 at 7-10; Doc. 116-9 at 25). Although the restaurant maintained the ability to serve the same number of customers as it had before the construction began, customer traffic decreased during the roadwork. (Doc. 116 at 3-5; Doc. 107-1 at 73-74; Doc. 110-8 at 56-57; Doc. 116-8 at 9-12; Doc. 116-9 at 24-27).

B.    The Insurance Policy

From September 19, 2013 to September 19, 2014, Berries was insured by Appellee, Sparta Insurance Company ("Sparta"). (Doc. 110-1 at 5, 31-54). Sparta issued an "all risk" commercial property insurance policy, which included, in relevant part, a Building and Personal Property Coverage Form and a Business Income (and Extra Expense) Coverage Form. (Doc. 110-1 at 31-54).

The Building and Personal Property Coverage Form contained in the policy covers "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." (Id. at 31). The policy defines

3

"Covered Causes of Loss" as "Risks of Direct Physical Loss unless the loss is" excluded or limited. (Id. at 33, 63).

The policy's Business Income (and Extra Expense) Coverage Form provides that Sparta will pay for "the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'" (Id. at 46). The policy provides that the "'suspension' must be caused by direct physical loss of or damage to" covered property. (Id.).

C.    The Initial Insurance Claim

On December 12, 2014, Berries submitted a claim to Sparta under the policy.  (Doc. 143 at 4). Berries asserted that the claim was related to dust and debris generated by the roadway construction. (Id.). Sparta assigned Corey Buford, an insurance adjuster, to review the claim on behalf of Sparta. (Doc. 116-10 at 5). Berries hired a public adjuster, Robert Inguanzo of Epic Group Public Adjusters, to assist with its claim. (Doc. 110 at 3).

In December 2014 and January 2015, Buford requested information about the claim from Berries. (Doc. 116-10 at 6-8, 17-19). In January 2015, Inguanzo responded to these requests and informed Buford that the claimed loss "occurred as early as December of 2013 in the form of construction debris and dust from the [roadwork]" and that, "the construction related debris and dust . . . caused damage

4

to the insured's building. The scope of loss includes but is not limited to, cleaning of the floors, walls, tables, chairs and countertops." (Id. at 17).

In March 2015, Inguanzo provided Berries with an estimate in the amount of $16,275.58 to clean and paint the restaurant. (Doc. 110-10 at 1-10; Doc. 116-11 at 11-15, 23-25; Doc. 116-12 at 5-6). Inguanzo testified that, "based on our inspection back then" the estimate encompassed "the work that we felt was necessary to bring the property to its pre-loss condition includ[ing] the cleaning and painting," and that, "[a]t that time, we didn't have anything for removal or replacement . . . ." (Doc. 116-11 at 14-15).

In April 2015, Inguanzo sent Buford a "Sworn Statement in Proof of Loss" for the building claim, including a preliminary damage estimate in the amount of $13,775.58. (Doc. 116-10 at 21). This amount was calculated based on the amount of the estimate -- $16,235.58 -- minus a deductible. (Id.). Inguanzo also sent Buford a "Sworn Statement in Proof of Loss" and supporting documentation regarding a business income claim in the amount of $292,550.84. (Id.). Berries contended that its 2014 sales were lower than expected when compared to its rate of sales growth in previous years. (Doc. 109-2).

On January 30, 2017, Sparta denied the claim because it was "not covered under the [] policy." (Doc. 110-13). As Sparta explained: "[w]ith regard to Building coverage, . . .  the Proof of Loss Form does not reflect the existence of

5

any physical damage. It is also questionable whether a direct physical loss occurred." (Doc. 110-13 at 5). Sparta also stated that:

> Under the Business Income Coverage Form, coverage is provided for the actual loss of business income the insured sustains due to the necessary "suspension" of "operations" during the "period of restoration." The "suspension" must be caused by <u>direct physical loss of or damage to property</u> at the premises . . . .

(Doc. 110-13 at 6) (emphasis in original).

D.      The Litigation and Presentation of a New Claim for Damages

Berries initiated this action in Florida state court in May 2017. (Doc. 1-2). Sparta removed the action to the United States District Court for the Southern District of Florida based on diversity jurisdiction. (Doc. 1). In its initial disclosures in the lawsuit, Berries claimed the same damages it had before the suit was filed: $16,275.58 for cleaning and painting the restaurant, and $292,550.84 for lower-than-expected sales in 2014. (Doc. 20 at 4).

On February 26, 2018, Berries also served amended answers to interrogatories. (Doc. 116-5 at 8). In those responses, it identified for the first time new categories of damages totaling $319,688.57. (<u>Id</u>.). Berries contended that the newly claimed damages were due to replacement of the restaurant's awning and retractable roof systems, HVAC repairs, and replacement of the restaurant's audio and lighting systems. (<u>Id</u>. at 8-9).

6

1.    Berries' Experts

Berries relied on three experts to causally link its newly-claimed damages to the construction dust and debris generated more than two and a half years earlier, i.e., during Sparta's policy period ending on September 19, 2014. First, Alex Posada offered opinion testimony about Berries' audio and lighting systems. Second, Christopher Thompson opined about the awning and retractable roof systems. Third, Alfredo Brizuela proffered his opinion about "engineering" and "the cause and origin of the loss." (Doc. 105-1 at 5-6; Doc. 113 at 2-4).

a.    Alex Posada

Posada's firm, United Audio, had "been in the audio and special lighting industry for over 15 years providing integrated audio, video, lighting & control solutions. . . ." (Doc. 109-1 at 2). Posada's proposed methodology included performing a "QC diagnostic" which would have involved, among other things, "[d]ismantl[ing] all Audio & Lighting Equipment, . . . [t]est[ing] all existing wiring and terminations[,] [d]isassembl[ing] each and every speaker and lighting fixture[],[t]est[ing] all audio devices[, and] [e]xamin[ing] all components in every lighting fixture." (Id. at 2-3; Doc. 108-1 at 51-53). However, Posada did not perform the QC diagnostic. (Doc. 108-1 at 53). Rather, in February 2018, he performed a two-hour site inspection and concluded that "it [wa]s more cost effective to replace the system." (Id. at 24-34).

7

At Posada's deposition, the following exchange occurred:

Q:    So is it fair to say if you want to find out a specific reason why a speaker or light is not working, you have to run this diagnostic? []

A:    It's an option.

Q:    What other options are there?

A:    There are no other options . . . it[']s either this or replace it which, I mean -- as of looking at it, I can already tell you it's not going to be worth doing this.

Q:    If you want to find out the specific reason why a subwoofer or speaker or light is not working, do you need to perform the diagnostic?

A:    It's an option. Yeah

Q:    But are there any other options?

A:    No, there is no other option.

Q:    That's the only option?

A:    That is correct.

(Doc. 108-1 at 55-56). Posada's inspection consisted of visually observing some of the system's audio and lighting components, and listening to some of its audio components. (Doc. 109 at 3; Doc. 108-1 at 51-53).

Posada did not inspect all of the restaurant's speakers and components because some were out of reach and, during his inspection, there were patrons in the restaurant whom he did not wish to disturb. (Doc. 108-1 at 24-25, 31-39). He only walked around the perimeter of the restaurant. (Id. at 34). Posada testified that

8

the speakers outside the restaurant's entrance were "probably" damaged, and although he did not inspect the subwoofers, he assumed that they were not working. (Id. at 43, 68-69). Posada nevertheless testified that all of Berries' audio systems were damaged by construction dust and debris, to the exclusion of all other causes, because they produced sounds that were "tedious," "distorted," and "hard to explain in words." (Id. at 88, 93-94).

Posada's inspection of Berries' lighting system involved observing components from ground level, about 15 feet below the fixtures. (Id. at 45). Posada testified that the lights did not turn on at all and were "full of dust." (Id. at 33, 44-45). Although he opined that the light fixtures' motherboards were damaged, Posada conceded that he could not see those components, and did not inspect them. (Id. at 87-88, 97-98). He did not know the age of the lighting fixtures, or when they stopped working. (Id. at 76, 87).

b.    Christopher Thompson

Thompson is employed by Awnings of Hollywood, the company that originally installed the awnings and retractable roof "several" (i.e., "more than three [-] four") years before his inspection. (Doc. 108-3 at 17-18, 32-33). Thompson's inspection of the restaurant's awnings and retractable roof consisted of a visual inspection from the ground floor, and lasted approximately one hour. (Doc. 108-3 at 29, 34, 83). His inspection took place more than two years after the

9

roadwork ended. (Id. at 26-29, 34-37). He did not take notes. (Id. at 34). Based on his one-hour inspection, Thompson concluded that the awnings and retractable roof systems were damaged beyond repair by sediment that he "assumed" was construction dust. (Id. at 46, 54; Doc. 109-3 at 1). Thompson took no samples of the sediment, and did no testing to determine its origin. (Doc. 108-3 at 45-46). Thompson had eaten at the restaurant during the road construction. (Doc. 108-3 at 46).

Thompson did not test the retractable roof system because he observed that the drive belt was broken. (Doc. 108-3 at 69). But, the belt was the only thing Thompson observed that was broken. (Id. at 69-70). In his report, Thompson noted that the system had to be replaced, rather than repaired, because the components were no longer available in the United States. (Doc. 109-3 at 1; Doc. 108-3 at 69). When asked why the drive belt snapped, Thompson testified: "I could not tell you. I have an opinion, but I couldn't tell you seriously." (Doc. 108-3 at 71).

c.      Alfredo Brizuela

Brizuela has a degree in architecture and structural engineering, and is a Florida licensed civil and structural engineer. (Doc. 108-5 at 26-27). His inspection of the restaurant consisted of a one-hour visual inspection conducted in December 2017 and a review of photographs taken in 2014 and 2015. (Doc. 108-5 at 42, 76-77). He also ran his "fingers across" dust (which he believed was construction

10

dust), although it had been over two years since the construction had been

completed. (Doc. 108-5 at 45, 57-59, 115, 154). Based on this inspection, he

offered the following opinion:

> [I]t is evident that the source of the damage was from the nearby
> roadway construction on 27th [A]venue in front of the property.
> Simply stated, the migration of the dust and its resulting paste was a
> sudden and accidental occurrence that damaged the equipment,
> awning, windows, railings, and stucco.

(Doc. 109-5 at 7). Brizuela's report explains how construction dust combined with

water can be corrosive. (Doc. 108-5 at 117). But, on the question of the source of

the corrosive material in this case, Brizuela acknowledged that his "testing was

strictly [his] observation through [his] inspection and [his] review of the

photographs." (Doc. 108-5 at 116). That is, Brizuela did nothing other than touch

the dust and look at pictures before opining as to its origin. (Id.). His opinion, like

Thompson's, was based on his assumption that the construction dust was the

source of the corrosive material. (Id.).

      2.     The District Court's Decision Ruling on the Motions in Limine
            Regarding Berries' Experts

In April 2018, Sparta filed a motion to preclude the testimony of Plaintiff's

expert witnesses: Posada, Thompson, and Brizuela. (Doc. 105). That same day, the

parties filed Cross Motions for Summary Judgment. (Docs. 106, 110). After

briefing, the district court entered an omnibus order granting Sparta's Daubert and

summary judgment motions. (Doc. 146). The district court found that, although

11

Berries' causation experts were minimally qualified to render their opinions, their methodologies on the issue of causation were unreliable or nonexistent, and their testimony was speculative. (Id. at 5-15). The district court further concluded that, without expert testimony, Berries could not prove that construction dust and debris generated in 2014 caused the "new" damages (first claimed in 2018) to Berries' awnings, retractable roof, HVAC system, railings, and audio and lighting system. (Id. at 15-17).

The district court determined that Berries' initial claim for cleaning was not covered because property that must be cleaned, but is not damaged, has not sustained a "direct physical loss." (Id. at 17-19). The district court also concluded that direct physical loss refers to tangible damage to property, which causes it to become unsatisfactory for future use or requires repairs. (Id. at 17-19). Finally, the district court decided that Berries' claim for lower-than-expected sales in 2014 was not covered because Berries could not establish that it suffered a "necessary 'suspension'" of its "operations" as the result of a "direct physical loss." (Id. at 19-20). Because of its determinations, the district court declined to address any of the parties' arguments related to the policy's exclusions or limitations. (Id. at 16, n. 14).

This appeal followed.

12

II.    Standard of Review

We review a district court's order granting summary judgment de novo, "considering all of the evidence in the light most favorable to the nonmoving party." Nesbitt v. Candler County, 945 F.3d 1355, 1357 (11th Cir. 2020). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)).

"We review for abuse of discretion a district court's evidentiary ruling under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)." Adams v. Lab. Corp. of Am., 760 F.3d 1322, 1327 (11th Cir. 2014) (parallel citations omitted). "'A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous.'" United States v. Alabama Power Co., 730 F.3d 1278, 1282 (11th Cir. 2013) (quoting Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1309 (11th Cir. 2001)). The deference we show on evidentiary rulings includes giving the court "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999). Even where a district court's ruling excluding expert testimony is

13

"outcome determinative" and the basis for a grant of summary judgment, our review is not more searching than it would otherwise be. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142-43 (1997).

III.    Analysis

Berries argues that the district court erred in three ways: first, by concluding that "direct physical loss" does not include cleaning, but rather requires a showing that the property be rendered uninhabitable or unusable; second, by requiring Berries to show that a suspension of operations was the result of physical damage in order to establish business income coverage; and third, in striking Berries' causation experts. We begin by addressing the exclusion of Berries' experts and then turn to the other two issues.

A.    Exclusion of the Experts

In Daubert, the Supreme Court explained that trial courts must act as "gatekeepers" and are tasked with screening out "speculative, unreliable expert testimony." Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010) (citing Daubert, 509 U.S. at 597). In that important role, trial courts may consider a non-exhaustive list of factors including: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential error rate of the technique; and (4) whether the technique is generally accepted in the scientific community. Kilpatrick, 613

14

F.3d at 1335. Later, in <u>Kumho Tire</u>, the Court explained that the gatekeeping function governs all expert testimony, including "scientific, technical, or other specialized knowledge," not just singularly scientific testimony. 526 U.S. at 147-49. The factors identified in <u>Daubert</u> "do not constitute a definitive checklist or test." <u>Kumho</u>, 526 U.S. at 150 (internal quotation marks omitted). Admittedly, they are designed to guide a district court's assessment of the reliability of scientific or experience-based expert testimony. <u>Id</u>. But, the district court's "gatekeeping inquiry must be tied to the facts of a particular case." <u>Id</u>. (internal quotation marks omitted). The goal of gatekeeping is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Id</u>. at 152.

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702. "We have distilled from Daubert, Kumho, and Rule 702 these three requirements: First, 'the expert must be qualified to testify competently regarding the matter he or she intends to address'; second, the expert's 'methodology . . . must be reliable as determined by a Daubert inquiry'; and third, the expert's 'testimony must assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue.'" Kilpatrick, 613 F.3d at 1335.

To be sure, experience, standing alone, is not a "sufficient foundation rendering reliable any conceivable opinion the expert may express." U.S. v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004). Even experienced experts "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Id. at 1261 (quoting Fed. R. Evid. 702 advisory committee note (2000 amends.)). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Joiner, 522 U.S. at 146.

### 1.    Alex Posada

The district court found that Posada, the audio and lighting expert, was qualified, but concluded that his methodology was unreliable. (Doc. 146 at 7, 10). We agree. Berries failed to establish that Posada's methodology was reliable.

16

Posada listened to the audio system and looked at the lighting system in 2018. From this brief inspection, he opined that any damage was caused by construction dust and debris from 2014. Posada identified what he thought to be the only diagnostic test to determine the reason why a speaker or light would not work, but he did not perform that test because "it [wa]s more cost effective to replace the system." (Doc. 108-1 at 24-34, 55-56). Posada performed no testing that would permit him to conclusively determine that the dust he observed in 2018 came from much earlier road construction. To the extent it can be said that Posada even identified a methodology for reaching his conclusions, he provided no testimony (or anything else) from which the district court could have concluded that his methodology was in any way reliable. See Kilpatrick, 613 F.3d at 1335 (the expert's "methodology . . . must be reliable"). Nothing about Posada's methodology is capable of being tested or being subjected to peer review, and Berries presented no evidence indicating that Posada's technique is generally accepted in the scientific community. Kilpatrick, 613 F.3d at 1335.

Under Daubert, a "district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation." Chapman, 766 F.3d at 1306. Here, the district court did not abuse its discretion in determining that Posada's testimony provided nothing

17

more than speculation about the cause of the damage to the audio and lighting systems.

### 2.    Christopher Thompson

The district court found that Thompson was at least minimally qualified as an expert based on his years of experience, but concluded that "Thompson's testimony is nothing more than unexplained assurances and unsupported speculation." (Doc. 146 at 12). Again, we agree. Berries did not establish that Thompson's opinions are reliable.

Like Posada, Thompson merely visually inspected the awnings and retractable roof, and did not do so until more than two years after the road construction. (Doc. 108-3 at 26-29, 34-37). Thompson observed a broken drive belt on the retractable roof, but candidly admitted he could not say what caused it to break. (Doc. 108-3 at 71). Although Thompson did not test the retractable roof system, he determined that it had to be replaced. (Doc. 109-3 at 1). This conclusion was based on Thompson's knowledge that parts for this system could no longer be obtained in the United States. (Id.). And, although Thompson performed no testing on the sediment on the awnings and retractable roof two years after the construction ended, he nonetheless opined that it came from that construction. (Id.; 108-3 at 27, 44-45).

Again, to the extent that Thompson even employed a methodology, there was nothing against which that methodology could be compared to determine whether it was reliable or even scientific in nature. See Chapman, 766 F.3d at 1306 (recognizing the court must ensure the "evidence is genuinely scientific, as distinct from being unscientific speculation."). Therefore, the district court did not abuse its discretion in excluding Thompson's testimony as unreliable.

> 3.    Alfredo Brizuela

Berries offered Brizuela as a cause and origin expert. He opined as to the source or origin of the damage to the restaurant. Brizuela opined that "[i]t is evident that the source of the damage was from the nearby roadway construction on 27th [A]venue in front of the property." (Doc. 109-5 at 7). In reaching this conclusion, he conducted a visual inspection of the restaurant, again over two years after the road construction ended. He conducted no sampling or testing of the dust and sediment he found at that time. His "methodology" was simply observation and a review of photographs. (Doc. 108-5 at 116).

Brizuela gave a scientific explanation about the general issue of how dust and debris can damage property. But, even if one accepted the general proposition that construction dust and debris can damage or corrode property, Brizuela did not actually attribute any damage to the restaurant as a result of that circumstance. (Doc. 146 at 12-15). His "methodology" in this respect consisted of an assumption.

Therefore, we conclude that the district court did not abuse its discretion in excluding Brizuela's proposed testimony as unreliable under Daubert.

Here, given its considerable leeway in assessing expert testimony, the district court did not err in concluding that Berries failed to establish that its experts' methodologies have been (or, for that matter, can be) tested. Berries also failed to show that its experts' methodologies have been subjected to peer review and publication. Berries also failed to address the known or potential error rates of its experts' techniques. And, Berries failed to establish that its experts' techniques are generally accepted in the scientific community. Simply stated, Berries did not satisfy any of the factors which indicate a reliable and admissible expert opinion. Accordingly, the district court did not abuse its discretion in excluding the experts. See Kilpatrick, 613 F.3d at 1335.

The district court correctly excluded the expert opinions proffered by Berries and this inexorably led to the swing of the summary judgment axe. "[A]n insured claiming under an all-risks policy has the burden of proving that the insured property suffered a loss while the policy was in effect." Jones v. Federated Nat'l Ins. Co., 235 So. 3d 936, 941 (Fla. 4th DCA 2018) (citation omitted). Berries relied on the expert reports of Brizuela, Thompson, and Posada to prove that the "new" damages to Berries' awnings, retractable roof, and audio and lighting system, first claimed in 2018, were caused by construction dust and debris from 2014. That is, it

20

was necessary for Berries to tie the damages it claimed in 2018 to construction occurring during the much earlier policy period, ending on September 19, 2014. Without the properly excluded experts' testimony, the district court properly granted Sparta summary judgment on Berries' newly claimed damages.

B.    Berries Failed to Show any "Direct Physical Loss or Damage"

Under Florida law, the interpretation of an insurance contract, including resolution of any ambiguities contained therein, is a question of law to be decided by the court. Dahl–Eimers v. Mutual of Omaha Life Ins. Co., 986 F.2d 1379, 1381 (11th Cir. 1993) (citing Sproles v. Amer. States Ins. Co., 578 So. 2d 482, 484 (Fla. 5th DCA 1991)). In construing an insurance contract, a court must strive to give every provision meaning and effect. Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000); Excelsior Ins. Com. v. Pomona Park Bar & Package Store, 369 So. 2d 938, 941 (Fla. 1979). A party claiming coverage (here, Berries) generally bears the burden of proof to establish that coverage exists. U.S. Liab. Ins. Co. v. Bove, 347 So. 2d 678, 680 (Fla. 3rd DCA. 1977). The policy at issue is an "all risks" policy. However, as the Florida Supreme Court has noted, "an 'all-risk' policy is not an 'all loss' policy, and thus does not extend coverage for every conceivable loss." Sebo v. Am. Home Assurance Co., 208 So. 3d 694, 696-97 (Fla. 2016) (citation omitted).

21

Berries' initial claim had two components: one for cleaning the restaurant, and another for Business Income Loss. (Doc. 110-10). The insuring agreement in the policy's Building and Personal Property Coverage Form states that Sparta "will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." (Doc. 110-1 at 31). The policy's Business Income Coverage Form provides that Sparta will pay for "the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'" (Id. at 46). The "'suspension' must be caused by direct physical loss of or damage to" covered property. (Id.).

Florida's District Court of Appeals for the Third District has addressed the definition of "direct physical loss": "A 'loss' is the diminution of value of something []. Loss, Black's Law Dictionary (10th ed. 2014). 'Direct' and 'physical' modify loss and impose the requirement that the damage be actual." Homeowners Choice Prop. & Cas. v. Maspons, 211 So. 3d 1067, 1069 (Fla. 3d DCA 2017); see also Vazquez v. Citizens Prop. Ins. Corp., 2020 WL 1950831, at *3 (Fla. 3d DCA 2020).

With regard to the cleaning claim, Berries's public adjuster, Inguanzo, testified that "cleaning and painting" was all that was required. (Doc. 76-1 at 35-36). He also testified that there was no need for removal or replacement of items at that time. (Id. at 36). Based on this testimony, the district court held that Berries

22

had failed to establish that it had suffered a "direct physical loss" as that term is defined under Florida law. (Doc. 146 at 18-19). We conclude that the district court correctly granted summary judgment on Berries' cleaning claim because, under Florida law, an item or structure that merely needs to be cleaned has not suffered a "loss" which is both "direct" and "physical." See Maspons, 211 So. 3d at 1069 (recognizing that "damage [must] be actual"); Vazquez, 2020 WL 1950831, at *3 (same). See also Universal Image Prods., Inc. v. Fed. Ins. Co., 475 F. App'x 569, 573 (6th Cir. 2012) ("[C[leaning . . . expenses . . . are not tangible, physical losses, but economic losses."); MRI Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co., 187 Cal. App. 4th 766, 779, 115 Cal. Rptr. 3d 27, 37 (2010) ("A direct physical loss 'contemplates an actual change in insured property."); AFLAC Inc. v. Chubb & Sons, Inc. (2003) 260 Ga.App. 306, 581 S.E.2d 317, 319 (same).

As to the Business Income Loss claim, the Business Income Coverage Form requires that a "suspension" of operations "be caused by direct physical loss of or damage to property." (Doc. 110-1 at 46). Again, as discussed above, even if Berries had shown a "suspension" of operations, Berries did not put forward any Rule 56 evidence that it suffered a direct physical loss of or damage to its property during the policy period. Therefore, the district court's entry of summary judgment on Berries' Business Income Loss claim was also proper. Berries failed to show it suffered a "direct physical loss."

23

C.      Berries Did Not Establish that it Suffered a Covered Suspension of Operations

The policy's Business Income Coverage Form provides that Sparta will pay for "the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'" (Id. at 46). Berries argues that the district court erred when it held that Berries did not suffer a "suspension" of its operations, and when it ignored evidence that Berries had been required to close sections of the restaurant for cleaning. Conceivably, a slowdown caused by closing parts of the restaurant for cleaning could be attributed to a "period of restoration." But, even if Berries is correct that the district court got this part of the analysis wrong, Sparta was still entitled to summary judgment on the Business Income Claim because any "'suspension' must be caused by direct physical loss of or damage to property." Berries failed to show it suffered a "direct physical loss." (Id.).

IV.    CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of Sparta is

AFFIRMED.

24