Filed 6/30/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SHERLENE WONG et al., Plaintiffs and Appellants, v. STILLWATER INSURANCE COMPANY, Defendant and Respondent. | A162893 (San Mateo County Super. Ct. No. 19CIV01195) |

Appellants Sherlene and Lawrence Wong (the Wongs) had stored some embryos at a facility that kept them in a cryogenic tank that failed to maintain the temperature necessary to store the embryos, following which the Wongs's fertility doctor told them they should consider the embryos "compromised" and "no longer viable, and lost." The Wongs had a homeowners insurance policy with respondent Stillwater Insurance (Stillwater), a specified perils policy providing that "We insure for direct physical loss to the property described in Coverage C caused by any of the following perils," going on to list 16 specified perils. The Wongs made a claim for property damage, which Stillwater denied. The Wongs sued, and Stillwater moved for summary judgment, on two bases: the Wongs could not submit evidence of (1) "direct physical loss" or (2) that "one of the sixteen specified perils occurred." The trial court granted summary judgment. We affirm.

# BACKGROUND

## The General Setting[1]

Beginning in 2014, the Wongs pursued in vitro fertilization, working with Aimee Eyvazzadeh, M.D., as their doctor. In 2015, the Wongs completed an in vitro fertilization (IVF) cycle, and obtained four viable embryos, one of which was implanted. As to the other three, as Dr. Eyvazzadeh put it, after discussion with the Wongs they determined to "bank the rest," which they did at Pacific Fertility Center (Pacific Fertility or PFC), a facility in San Francisco that included several cryogenic storage tanks that used liquid nitrogen to store human embryos at very low temperatures. Specifically, the embryos were stored in Tank 4, which also contained embryos belonging to other people.

On or about March 4, 2018, Tank 4 failed to maintain the temperature necessary to store embryos, as a result at least some (and possibly all) of the embryos stored in that tank partially or totally thawed.

On March 11, Pacific Fertility sent its patients, including the Wongs, an email stating that "[e]arlier this week, a single piece of equipment lost liquid nitrogen for a brief period of time," and that Pacific Fertility was "continuing to gather information."

The next month, on or about April 19, Pacific Fertility sent its patients, including the Wongs, a letter stating that "[p]reliminary findings" indicated that the temperature of Tank 4 had risen due to "a failure of the tank's vacuum seal" and that "investigations into all aspects of this incident continue."

---

[1] Many of the pertinent background facts were agreed to in a joint stipulation below, which stipulation is the basis of some of the background here.

The Wongs had a homeowners insurance policy with Stillwater that under "Coverage C" provided coverage for personal property the Wongs "owned or used" while "anywhere in the world," with policy limits for personal property of $502,720.  The policy was a "specified perils" policy, the significance of which is that in order to demonstrate a covered loss the insured has "the threshold burden of proving the loss was caused by a *specifically-enumerated peril*."  (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2022) ¶ 6:253.2 (Croskey).) Specifically, the policy provided that "We insure for direct physical loss to the property described in Coverage C caused by any of the following perils," going on to list 16.[2]

On May 2, on behalf of the Wongs, attorney David Rosenberg-Wohl sent a letter to Stillwater making a claim under the policy, a letter that read in its entirety as follows:

"I represent Lawrence and Sherlene Wong, who had three zygotes frozen in a tank at Pacific Fertility Center, which they entrusted to serve them as IVF patients for family planning.  The Wongs have been advised by their fertility physician, Dr. Aimee Eyvazzadeh, that they should consider these zygotes to have been irretrievably compromised by the recent tank

---

[2] The 16 perils were identified as follows:  "¶1.  Fire Or Lightening; ¶2.  Windstorm Or Hail . . .; ¶3.  Explosion; ¶4.  Riot Or Civil Commotion; ¶5.  Aircraft . . .; ¶6.  Vehicles; ¶7.  Smoke . . .; ¶8. Vandalism Or Malicious Mischief; ¶9.  Theft . . .; ¶10.  Falling Objects . . .; ¶11.  Weight Of Ice, Snow Or Sleet . . .; ¶12.  Accidental Discharge Or Overflow Of Water Or Steam . . .; ¶13.  Sudden And Accidental Tearing Apart, Cracking, Burning Or Bulging [meaning] sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, and air conditioning or automatic fire protective sprinkler system or an appliance for heating water; ¶. Freezing . . .; ¶15.  Sudden And Accidental Damage From Artificially Generated Electrical Current . . .; ¶16.  Volcanic Eruption."

disaster at Pacific Fertility Center on or about March 4, 2018, and that their zygotes are no longer viable, and lost.

"Under my clients' homeowners policy (#NP6063026), my clients are covered under 'Coverage C' for loss of personal property up to $516,790. Because my clients have lost three zygotes, each of which has a financial value well in excess of the personal property limits, the Wongs have a potential claim against Stillwater . . . for $516,790 x 3, or $1,550,370. If each has a separate claim, the amounts double.

"We are presently preparing litigation against Pacific Fertility Center, its parent/owner/investor, Prelude Fertility, Inc. the manufacturer of the nitrogen tank (which we believe to be Chart Inc./Chart BioMedical), and any others who share responsibility. I am writing you because the homeowners policy requires prompt notice following a covered loss."

As is apparent, Mr. Rosenberg-Wohl's letter did not refer to any of the 16 perils.

Mr. Rosenberg-Wohl later submitted various documents to Stillwater, one of which was a printout of the March 11 email from Pacific Fertility that stated among other things that tissue "may have been impacted" but that "we do expect that some of the tissue from the tank remains viable." Another was a letter postmarked April 20, in which Pacific Fertility stated that "[p]reliminary findings" indicated it was "likely" there had been "a failure of the tank's vacuum seal," that "investigations into all aspects of this incident continue," and that Pacific Fertility had confirmed "there is viable tissue from the tank."

The Wongs's claim was assigned to Matt Maloley, senior claims examiner at Stillwater. Stillwater retained attorney Michelle Burton to evaluate the Wongs's claim, providing her a copy of the policy, the email

4

dated March 11, the letter postmarked April 20, and Mr. Rosenberg-Wohl's letter.

On August 3, Ms. Burton sent Stillwater a letter that outlined her coverage evaluation, which among other things concluded that she "cannot ascertain from the file whether the insured's zygotes were compromised, whether they are still viable or whether there has been a determination either way." And, she further concluded, there was no evidence the claimed damage resulted from any of the 16 perils that apply to personal property as set forth in the policy.

On August 6, Maloley sent Mr. Rosenberg-Wohl a letter denying the Wongs's claim, which letter stated in pertinent part as follows:

"We received and reviewed the documents sent via email dated July 6, 2018 and related to the insureds' loss of zygotes due to a mechanical failure of the storage tank's vacuum seal.

"My review of the policy finds that coverage is only provided for loss to personal property which is the result of one of the named perils for which the policy extends coverage. Because the loss was not the result of one of the named perils for which the policy extends coverage, we regret to inform you that we will be unable to compensate for the costs associated with this loss.

"These limitations and exclusions in coverage are located in your policy and policy endorsements as cited below.

"**<u>ENDORSEMENT A6140 07 15</u>**

"**Under SECTION I – PERILS INSURED AGAINST, B. Coverage C – Personal Property**, the first paragraph is deleted in its entirety and replaced by the following:

5

"We insure for sudden and accidental direct physical loss to property described in Coverage C caused by any of the following perils unless the loss is excluded in **SECTION I – EXCLUSIONS.**

"**POLICY HO 00 03 05 11**

"**SECTION I – PERILS INSURED AGAINST**

"1.  Fire Or Lightning

"2.  Windstorm Or Hail

"3.  Explosion

"4.  Riot Or Civil Commotion

"5.  Aircraft

"6.  Vehicles

"7.  Smoke

"8.  Vandalism Or Malicious Mischief

"9.  Theft

"10.  Falling Objects

"11.  Weight Of Ice, Snow Or Sleet

"12.  Accidental Discharge Or Overflow Of Water Or Steam

"13.  Sudden And Accidental Tearing Apart, Cracking, Burning Or Bulging

"14.  Freezing

"15.  Sudden And Accidental Damage From Artificially Generated Electrical Current

"16.  Volcanic Eruption

"There may be other reasons why coverage does not apply.  We do not waive our rights to deny coverage for any other valid reason, which may arise.

"Our decision is based on the information you have presented to us, including information noting the loss was the result of the mechanical failure of a storage tank. If you have information that supports a different cause of loss, or which would be relevant to this claim, please forward this information to us for our consideration.

"Since we have properly addressed all known and related damages, we are closing your file as of the date of this letter. If you believe there is any issue related to this claim that we have not yet properly recognized and concluded, please forward this information to us for our consideration. . . ."

This lawsuit followed.

**The Proceedings Below**

On March 5, 2019, represented by Mr. Rosenberg-Wohl, the Wongs filed a complaint naming as defendants Stillwater and Government Employees Insurance Company (GEICO). The complaint alleged five causes of action labeled (1) breach of contract, (2) negligence, (3) declaratory judgment, (4) injunctive relief/specific performance, and (5) unjust enrichment. However, within the breach of contract claim was reference to breach "of the covenant of good faith and fair dealing," and within the negligence claim was that defendants "failed to comply with is duties as a fiduciary of Plaintiffs."[3] So, however inartfully, the complaint alleged, or at least referred to, seven causes of action.

On January 15, 2020, Stillwater filed a motion for summary judgment or, alternatively, summary adjudication. The fundamental argument was that the Wongs "cannot establish essential elements" of the breach of contract

---

[3] The complaint did not distinguish between the two defendants as to any of the causes of action, but as to GEICO alleged that it had issued an umbrella policy. No third party claim was made against the Wongs, and in June 2019, they dismissed the case as against GEICO.

7

claim because "the policy covers personal property only for 'direct physical loss' caused by one . . . of the [16] specified perils." And it continued, the "Wongs bear the burden of proving that the alleged loss falls within the Insuring Agreement," which they failed to do in two particulars, as they did not submit evidence of (1) "direct physical loss" or (2) that "one of the sixteen specified perils occurred."

On this latter point—no proof of any specified peril—their argument referred to the written communications from Pacific Fertility, which argument Stillwater summed up as follows: "In short, the Wongs never provided Stillwater with *actual* evidence of why Tank 4 failed to maintain proper temperature. Instead, the Wongs merely conveyed to Stillwater what Pacific Fertility characterized as 'preliminary findings,' i.e., that a 'vacuum seal' on Tank 4 had failed. [¶] Importantly, Stillwater itself does not contend that a 'vacuum seal' on Tank 4 had failed. In other words, Stillwater is *not* offering Pacific Fertility's statements to prove the truth of those statements. Instead, Stillwater is only offering Pacific Fertility's statements to show what information the Wongs provided to Stillwater—and to show that the Wongs never submitted any evidence that one of the policy's sixteen specified perils had actually occurred. Further, as will be explained, even if the Wongs were to now *actually prove* that a 'vacuum seal' on Tank 4 failed, such an event still would not constitute one of the sixteen perils specified in the policy."

Apparently looking at which of the 16 specified perils could possibly be pertinent, the motion went on to demonstrate that the loss was not caused by "Peril 12," which covers damage caused by the "discharge or overflow of *water or steam* from within *a plumbing, heating, air conditioning or automatic fire protective sprinkler system from within a household appliance*." The motion pointed out that liquid nitrogen is not "water" or "steam," and a cryogenic

8

storage tank that uses liquid nitrogen to store human embryos at an extremely cold temperature "cannot reasonably be characterized as a 'plumbing, heating, air conditioning or automatic fire protective sprinkler system or . . . a household appliance.' "

Similarly, the motion demonstrated that the loss was not caused by "Peril 13," which "covers damage caused by the 'sudden and accidental tearing apart, cracking, burning or bulging of *a steam or hot water heating system, and air conditioning or automatic fire protective sprinkler system or an appliance for heating water*.' " Thus, the motion summed up, "the Wongs's have no evidence that one of the sixteen specified perils occurred."[4]

The Wongs filed their opposition to the motion that, to the extent it addressed the issues pertinent here, was brief indeed, less than three pages. The opposition was accompanied by declarations of both of the Wongs, their attorney, Mr. Rosenberg-Wohl, and their fertility doctor, Dr. Eyvazzadeh. As the stipulation would later provide, the Wongs had no personal "knowledge of the precise reason Tank 4 failed to maintain the temperature necessary to store embryos." Mr. Rosenberg-Wohl's short declaration essentially sought to authenticate five exhibits. And Dr. Eyvazzadeh's declaration testified to her training, background, professional experience, including with Pacific Fertility, and mostly to her years-long relationship with the Wongs. As possibly relevant to the issues here, Dr. Eyvazzadeh's declaration had these two paragraphs:

"8. As a result of this disaster, the Wongs' embryos became worthless. No responsible fertility physician would use them; I certainly would not.

---

[4] The motion went on to argue that the other causes of action failed because they were dependent on the breach of contract claim.

9

"9.  The science behind IVF is precise, including what we know about vitrification.  We don't know the consequences of embryos that could have partially thawed.  We don't 'wing it' or guess that something is 'close enough.'  There was—and is—no way to know about the resulting consequences to cells themselves.  While it would be possible to look at thawed zygotes and observe the outer structure of cells to observe apparent integrity, even if the cell walls were to appear sound, there is no way to know whether the cells, once implanted, begin to divide.  Nor is there a way to test sufficiently for any resulting damage to genes within any of these cells.  I advised the Wongs that they should consider these embryos to have been irreversibly compromised, no longer viable, and lost."

The Wongs's opposition memorandum of points and authorities was a total of 19 pages, with a table of contents that lists three items: (1) "Introduction"; (2) "The Wongs have coverage for their property loss"; and (3) "Stillwater's investigation and denial of the Wongs'[s] claim was unreasonable and improper. . . ."  The introduction acknowledged among other things that the Wongs "accept virtually all of the legal arguments advanced by Stillwater," including specifically that they "recognize that they have the burden of proving that their loss was caused by a covered peril," going on to assert that "they provide evidence below that they lost their embryos due to an explosion, a covered peril, at PFC"—the first time the Wongs referred to "explosion."  The introduction also acknowledged that the Wongs "recognize that they need to make a showing of actual loss, but any 'physical alteration' suffices, even if not visible to the naked eye.  *See MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.,* 187 Cal.App.4th 766, 778–[7]89 (2010) [(*MRI*)]."  And finally the introduction ended with this:  "The Wongs accept that without coverage, their tort claim

10

for violation of the covenant of good faith and fair dealing falls (COA 1), as does their claim for negligence (and their claim for breach of fiduciary duty) (COA 2). The Wongs also accept that their claims for declaratory relief (COA 3) and for specific performance (COA 4) are contract-dependent. It doesn't matter, because their claim for breach of contract is solid."

As to their arguments on the merits, the Wongs argued that "the embryos were lost in the [Pacific Fertility] explosion, which prematurely thawed and damaged the cells in the tank." Then, after a brief two-paragraph argument on this, the opposition concluded with these two brief arguments:

"C. <u>Regardless, Stillwater has waived any challenge to the question of property loss</u>.

"Stillwater, despite concluding that it could deny coverage on the grounds that the embryos were not covered property, decided to forego that basis for denial and use instead only that the peril was not covered. [Citation.] This was an intentional choice, made internally and expressed in the denial letter. [Citation.] A jury could easily see this as grasping at an apparently easy basis for denial and avoiding the risk of insulting policyholders with a possibly offensive claim that this was not in fact property at all. Regardless, the Wongs took the basis for Stillwater's decision at face value. [Citations.] All that Stillwater reserved was if it happened upon a new basis for denial—but it had already fully considered and chose not to deny on the basis of personal property loss. [Citation.]"

Then, after citing to some state regulations, the opposition argued that "Stillwater should be precluded from arguing in this case that coverage is somehow precluded on the basis of personal property loss. [Citation.] Here, the record is unequivocal."

11

"D.  <u>And the loss of the embryos was precisely what Stillwater prematurely determined it was not:  the result of a covered peril, namely an explosion</u>.

"Peril is not defined.  [Citation.] But an explosion is a covered peril. [Citation.]

"At the time Stillwater denied the claim, it had no information as to the cause of the disaster.  All that Stillwater had was what PFC had provided to the Wongs, which the Wongs'[s] counsel had provided to Stillwater:  there was preliminary information from PFC that what had failed was the tank seal.  [Citation.]  But there was no information as to how that had happened and therefore the cause, or peril.  [Citation.]

"Coverage counsel guessed that the cause was 'freezing' so she could recommend denial.  [Citation.]  She explicitly stated the cause was not an explosion.  [Citation.]  Stillwater denied the claim on this basis.  [Citation.] Actually Stillwater improved upon her guess, declaring that the cause was 'mechanical failure.'  [Citation.]

"An explosion was, in fact, determined to be the cause of the disaster. SSUF 140."

The Wongs's opposition did not support the basis of their position that the loss was caused by an "explosion," other than referring to "SSUF 140." The claimed support for the contention was in exhibit O to Mr. Rosenberg-Wohl's declaration, which was a copy of some selected pages of a 185-page deposition taken of Dr. Anand Kasbekar in a case in the United States District Court in Colorado—a deposition, not incidentally, that was not signed.

According to the excerpt from the deposition, Dr. Kasbekar and the questioning attorney had this exchange at pages 20 to 22  of the deposition:

12

"Q. Once you were retained in this case, what did you do to familiarize yourself with cryogenic tanks, generally?

"A. I think early on, I was looking for examples of implosions. Honestly, I've seen tank explosions in some of the cases I've been involved in, but I haven't seen an implosion similar to the one that we had here. So I was looking for information about that. I had a theory as to how I thought it happened, but I hadn't looked at the tank closely at that point. I think that was the main thing I was looking at.

"Q. Is it your view—not your view. Is the word that you used to describe what happened to Tank 4 an implosion or an explosion?

"A. So my opinion really is I would call it an explosion of the vacuum space, but I think it's fair to also call it an implosion of the inner wall of the tank. It's—normally when I think of an implosion, I think of—and in cryogenic tanks and failure analysis, its normally when you've sucked a vacuum on the internal tank space, and where you often see it in tankers and—where there's been an issue, and it's pretty dramatic when you have the loss of pressure inside the tank and atmospheric pressure bearing down on the outside of the tank.

"Q. I totally agree because the words are funky.

"A. But your client uses, to the best of my knowledge, the word 'implosion,' which I think—I don't know if it's technically incorrect or not. It's kind of tomato, tomato.

"Q. I think the reference might be implosion towards the midline of the tank. I think that might be it, but just so we're clear, when we say 'implosion' or 'explosion' we're referring to pressure being exerted against both the inside and the outside of the walls with the thinner tank walls buckling. Is that fair?

13

"A. Well, I don't know if I'd phrase it that way. If you're going to argue it's an implosion, you have a lower pressure on the interior of the tank than you do on the exterior of the interior tank wall. Does that make sense?

"Q. That makes sense.

"A. So that would—the lack of pressure on the inside or the imbalance, you could argue, would be an implosion. I really look at it more as if the vacuum space becomes a balloon and nitrogen gas expands within that vacuum space or balloon, you're exploding that vacuum space. The outside wall is more robust than the inside wall, so the damage occurs to the inside wall.

"Q. All right. Let's use the word 'explosion.'

"A. Fair enough."

On December 14, Stillwater filed its reply to the Wongs's opposition, included within which was an objection to the Dr. Kasbekar material as hearsay and lack of foundation.

As to the no "physical loss" issue, Stillwater's reply argued that Dr. Eyvazzadeh's declaration established what Stillwater had contended from the outset, that the Wongs could not meet their burden of proving a "physical loss" because Dr. Eyvazzadeh herself admitted there is "no way to know" whether the Wongs's embryos had undergone an actual physical change.

As to the "specified peril" issue, Stillwater's reply argued that Dr. Kasbekar's deposition testimony in the federal case was hearsay and for several reasons was not admissible. Among other things, Stillwater argued that because it was not a party to the federal court case and not present at Dr. Kasbekar's deposition, Stillwater had no opportunity to cross-examine him. Finally, Stillwater argued that even if the court were to consider

14

Dr. Kasbekar's deposition testimony, it did not demonstrate an "explosion" as that term is understood by ordinary persons.

Stillwater's motion came on for hearing on January 26, 2021, prior to which the trial court had issued a tentative ruling that, as the court itself would later describe it in an attachment to the order granting summary judgment, put the motion in the following posture for argument:

"On January 25, 2021, the Court issued a tentative ruling which found questions of fact on whether the Plaintiffs suffered property damage and whether Defendant waived the issue. For the Court, a key issue was whether deposition testimony provided by an expert, Anand Kasbekar, PhD, in another case, who opined that the loss was caused by an explosion, was admissible. If the transcript was admissible, the testimony would create an issue of fact on whether the cause of the incident was a covered peril under the policy. The transcript was attached as Exhibit O to the Declaration of David M. Rosenberg-Wohl, Plaintiffs' counsel.

"Defendant objected to the expert testimony in its entirely [*sic*] on the basis of hearsay and no foundation. [Citation.] This deposition was taken on December 13, 2019 in *In re Pacific Fertility Center Litigation*, Case No. 3:18-cv-01586-JSC pending in the United States District Court, District of Colorado. The deposition was taken in Denver Colorado and the oath is not set forth in the transcript. [Citation.] Mr. Rosenberg-Wohl was not present at the deposition. [Citation.] Mr. Rosenberg-Wohl's declaration states that he down-loaded it from a document depository maintained by plaintiffs' counsel in a federal action and which is the subject of a request for judicial notice. Rosenberg-Wohl's Declaration, paragraph 2 attached to the Notice of Motion and Motion for Order Sealing Portion of Record filed October 7, 2020.

The Request for Judicial Notice only referred to Evidence Code sections 452 and 453 generally.

"Since Defendant had not provided any analysis of the objection to Dr. Kasbekar's deposition and Plaintiffs had not responded to the objections, the Court's tentative requested argument on this issue. The tentative stated:

"The Court withholds issuing a tentative on the objections to the testimony of Anand Kasbekar, PhD. If the Court considers the testimony of Dr. Kasbekar, then the Court finds that there are issues of fact on whether there was an explosion, a covered peril. While Stillwater argues that his opinion should not be considered because it is an expert opinion, contrary to the lay definition of explosion, the Court cannot find as a matter of law in ruling on a summary judgment motion, that the opinion is unreasonable. Thus, if the testimony is considered, it raises questions of fact precluding summary judgment/adjudication. The parties, however, are to present argument on whether the testimony is admissible. The Court directs the parties' attention to *Sweetwater Union High School Dist. v. Gilbane Bldg. Co.* (2019) 6 Cal.5th 931, 948–949 [(*Sweetwater*)]; *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 543 [(*Perry*)]; *Williams v. Saga Enterprises, Inc.* (1990) 225 Cal.App.3d 142, 149 [(*Williams*)]; and any other case law that they believe appropriate. If the parties are going to rely on any other authority, they are to email . . . ."

Against that background, the hearing occurred. And at one point in the hearing, addressing Mr. Rosenberg-Wohl, the court stated that if Dr. Kasbekar "had not been disclosed, then his testimony would not be admissible at trial and . . . therefore under the *Perry* decision could not be introduced on summary judgment." Mr. Rosenberg-Wohl did not meaningfully respond, and then asked for the opportunity to provide a "case

16

citation . . . today." The court took a recess, following which Mr. Rosenberg-Wohl cited to two cases, the first of which was ordered not published. The second was *Egan v. Mut. Of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 817, which he claimed supported his position that to recover on his bad faith claim he had "no burden to show that there is coverage under the policy."

Following some further colloquy, the court concluded as follows:

"THE COURT:  Wait.  Let me just stop you.  I am sorry, but I disagree. So what I am going to do is I am going to sustain the objections to the . . . deposition testimony of Kas[b]ekar.  I am going to keep my—in case it goes up, I guess if it goes up on appeal, it's all de novo, but I find that since the deposition testimony would not be admissible at trial, because the expert was not disclosed, that the summary judgment is granted, because of a failure of the plaintiff to raise any issue showing that it was a covered peril.

"So I will be granting the summary judgment. . . .  The minutes should say that summary judgment is granted and that it's modified as to the portion of it as—as to the deposition testimony from Dr. Kas[b]ekar, . . . and that if the summary judgment is granted on the first cause of action, the rest of it, cause of action, also fails."

On February 9, the trial court filed its order granting the motion for summary judgment, which order provided in pertinent part as follows:

"After hearing argument of counsel, the Court ruled as follows:

"The Court granted the request for judicial notice (submitted by Stillwater) and the request for judicial notice (submitted by the Wongs).

"The Court overruled Stillwater's Objections 1, 2, and 3, but sustained Stillwater's Objection 4, to the declaration of Aimee Eyvazzadeh, M.D. [¶] . . . [¶]

17

"Sustained Stillwater's Objection 1 to the deposition testimony of Anand David Kasbekar, Ph.D. (Exhibit O, submitted by the Wongs).

"Because the Wongs did not designate Anand David Kasbekar, Ph.D. as an expert, his deposition testimony taken in another case would be inadmissible at trial of this case and, therefore, his deposition testimony cannot be used to create a triable issue of fact about whether an 'explosion' occurred.

"In the absence of admissible evidence of an 'explosion' (or some other peril specified in the Stillwater insurance policy), the Wongs cannot establish their cause of action for breach of contract.

"Because the Wongs cannot establish their cause of action for breach of contract, all other causes of action (whether characterized as breach of the implied covenant of good faith and fair dealing, negligence, declaratory relief, injunctive relief, specific performance, unjust enrichment, breach of fiduciary duty or otherwise) fail as a matter of law.

"Stillwater has met its burden of demonstrating that the causes of action alleged in the Wongs'[s] complaint cannot be established, and the Wongs have not raised a triable issue of material fact as to any of those causes of action pursuant to Code of Civil Procedure section 437c[, subdivision] (p)(2).

"Therefore, the Wongs'[s] complaint is subject to summary judgment.

"**IT IS THEREFORE ORDERED** that Stillwater's motion for summary judgment is GRANTED, and that judgment in favor of Stillwater and against the Wongs shall be entered accordingly."

The order then added, in the handwriting of the court, this: "See attachment incorporated by reference hereto . . . ." The attachment included the passage quoted above as to the tentative ruling, and then included this

18

entry made after the argument: "After hearing the argument and Plaintiffs' concession that the parties had disclosed experts but that Plaintiffs had not disclosed Dr. Kasbekar, the Court sustained the objection to the admission of Dr. Kasbekar's deposition. Although a deposition from another case may be admissible, *Sweetwater*, [*supra*,] 6 Cal.5th at [pp.] 948–949; *Williams*, [*supra*,] 225 Cal.App.3d at [p.] 149, the testimony must be admissible at trial. [*Sweetwater*,] at [p.] 948; *Perry*, [*supra*,] 2 Cal.5th at [p.] 543; Weil & Brown, *Cal. Prac. Guide Civ. Pro. Before Trial* § 10:205 (TRG 2020). In this case, the testimony could not be admissible because of Plaintiffs' failure to identify Dr. Kasbekar as an expert. *Perry* at [p.] 543. The deposition transcript was thus hearsay. While Plaintiff argued that Dr. Kasbekar was not an expert and did not need to be disclosed, the Court disagrees. His testimony in the federal case was as a retained expert and he did not have personal knowledge of what occurred. [Citation.] Since Plaintiffs did not introduce any evidence which would be admissible at trial to counter Defendant's evidence that the incident occurred because of a failure of the tank's vacuum seal, Undisputed Fac[t] No. 4-7, summary judgment was appropriate."

The Wongs filed a motion for reconsideration based on Mr. Rosenberg-Wohl's declaration that he "came across" the transcript of Dr. Kasbekar's deposition in a database pertaining to the many cases arising from the failure of Tank 4; that he had "no relationship" with Dr. Kasbekar and had never even spoken to him; and that he had offered to hire Dr. Kasbekar, but the lawyer who had hired him as an expert in the Colorado case specifically refused to allow him to consult with, or otherwise work for, Mr. Rosenberg-Wohl. Nonetheless, Mr. Rosenberg-Wohl maintained that his use of excerpts of Dr. Kasbekar's deposition to oppose Stillwater's motion was tantamount to

19

a designation of experts that complied with Code of Civil Procedure section 2034.260 et seq.

The trial court denied reconsideration, and confirmed the order granting summary judgment. The court noted that the Wongs "made no effort, after the Court's grant of summary judgment, to retain Dr. Kasbekar or some other expert with the same opinion, and then file a motion to supplement their expert witnesses." And, the court held, "Accordingly, summary judgment is still proper because Dr. Kasbekar's testimony is not admissible at trial. Plaintiffs have no evidence to demonstrate that there was an explosion at the fertility clinic and, therefore, cannot demonstrate a covered peril."

Judgment was entered in favor of Stillwater, from which the Wongs filed an appeal.

## DISCUSSION

### Summary Judgment and the Standards of Review

"A party may move for summary judgment in an action or proceeding if it is contended that the action has no merit . . . ." (Code Civ. Proc., § 437c, subd. (a)(1) (Section 437c).) And summary judgment will be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Section 437c, subd. (c).)

A defendant "moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that [the defendant] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) And to prevail, a defendant must show that one or more elements of the challenged cause of

20

action cannot be established or that there is a complete defense to it. (*Id.* at p. 849; *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477.)

We review a "grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. [Citations.]" (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) Put another way, we exercise our independent judgment, and decide whether undisputed facts have been established that negate plaintiff's claims. (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487.) As we put it in *Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320: "[W]e exercise an independent review to determine if the defendant moving for summary judgment met its burden of establishing a complete defense or of negating each of the plaintiff's theories and establishing that the action was without merit." (Accord, *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)

"We accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them" (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67), and we view the evidence in the light most favorable to the Wongs as the losing parties. (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 254.)

Finally, there is the principle that we must affirm a summary judgment if it is correct on any of the grounds asserted in the trial court, regardless of the reasons stated by the trial court. (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630 ["We need not defer to the trial court and are not bound by the reasons in its summary

21

judgment ruling; we review the ruling of the trial court, not its rationale"]; *Grebing v. 24 Hour Fitness USA, Inc.* (2015) 234 Cal.App.4th 631, 637.)

As to the trial court's ruling as to the admissibility of expert testimony, we review it for abuse of discretion. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).

Applying those principles here leads to the conclusion that the summary judgment was correct.

**The Summary Judgment Was Correct**

*Introduction*

The burden is on the insured "to prove facts establishing the claimed loss falls within the coverage provided by the policy's insuring clause." (*MRI*, *supra*, 187 Cal.App.4th at p. 777.) As our Supreme Court has described, the insured's burden is "to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage." (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1188.)

Here, as quoted, the insuring clause in the Stillwater policy provided that "we insure for sudden and accidental direct physical loss to property described in Coverage C caused by any of the following perils . . . unless the loss is excluded in Section I." So here, as in *MRI*, the "accidental direct physical loss requirement is part of the policy's insuring clause and accordingly falls within the [insured's] burden of proof." (*MRI*, *supra*, 187 Cal.App.4th at p. 778.)

This, the Wongs failed to meet, beginning with their inability to demonstrate a direct "physical loss."

*No Evidence of Direct Physical Loss*

By way of brief background, the Wongs's opposition below argued among other things that Stillwater had "waived" any argument that "the

embryos were *not covered property*," that is, that the embryos were excluded. Stillwater never asserted—not in its denial letter, not in its motion for summary judgment—that the embryos were "not covered property," but rather that the Wongs had not established that the embryos had sustained "physical loss." Despite that, as quoted above, the court's attachment noted that "the Court issued a tentative ruling which found questions of fact on whether Plaintiffs suffered property damage and whether Defendant waived the issue."

The fact is, the Wongs did not argue below that Stillwater waived the "physical loss" requirement. Indeed, as to this the Wongs submitted claimed legal authority on the issue and also the declaration of Dr. Eyvazzadeh, the Wongs's fertility doctor. And while the trial court noted, however passingly, that somehow there was a triable issue of fact, our de novo review leads to a contrary conclusion.[5]

Dr. Eyvazzadeh testified that she had requested Pacific Fertility to conduct a test of one of the Wongs's embryos, but that Pacific Fertility declined; and, she went on, there is "no way to know" whether the Wongs's embryos actually sustained physical damage. And having determined that there is "no way to know" whether the Wongs's embryos had actual physical damage, she deemed them to be "worthless" and "advised the Wongs that they should consider these embryos to have been irreversible compromised, no longer viable, and lost." That does not create a triable issue of material fact as to "physical loss."

---

[5] While we review a summary judgment motion by the same standards as the trial court, we must " 'independently determine as a matter of law the construction and effect of the facts presented.' " (*Oakland Raiders v. National Football League* (2001) 93 Cal.App.4th 572, 581.)

*MRI*, *supra*, 187 Cal.App.4th 766 is persuasive. The issue there involved an insured's claim under a business interruption policy for loss of income as a result of claimed damage to its magnetic resonance imaging machine after the machine failed to satisfactorily ramp up after it was ramped down. The trial court granted summary judgment for State Farm, on the basis that the insured could not demonstrate a "physical loss."

The Court of Appeal affirmed, holding as follows: "In modern policies, ' "physical loss or damage' " is typically the trigger for coverage. [Citation.] Clearly, this threshold is met when an item of tangible property has been 'physically altered' by perils such as fire or water. [Citation.] However, serious questions crop up in instances when the structure of the property itself is unchanged to the naked eye and the insured claims its usefulness for its normal purposes has been destroyed or reduced. [Citation.] That the loss needs to be 'physical,' given the ordinary meaning of the term, is 'widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.' " (*Id.*, at pp. 778–779.) And, the court added: "A direct physical loss 'contemplates an *actual change* in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.' [Citation.] . . . For loss to be covered, there must be a '*distinct, demonstrable, physical alteration*' of the property." (*MRI*, at p. 779, italics added.)

Dr. Eyvazzadeh's concession there is "no way to know" whether the Wongs's embryos had actual physical damage was devastating to the Wongs's claim. And her conclusion that she deemed the embryos to be "worthless"

was not a substitute for evidence that any of the embryos actually had undergone a physical change. Again *MRI* is apt: "Neither diminution in value nor the cost of repair of replacement are active physical forces—they are not the cause of the damage . . . [they are] the measure of the loss or damage." (*MRI, supra,* 187 Cal.App.4th at p. 780.) Put slightly differently, " 'Diminution in market value' is not a 'peril' at all; it is a method of measuring damages." (*State Farm Fire & Casualty Co. v. Superior Court* (1989) 215 Cal.App.3d 1435, 1444.)

The mere possibility that the embryos had suffered physical damage was insufficient to create a triable issue of fact to trigger coverage. The Wongs had the burden of submitting evidence of actual physical alteration of the embryos. They did not, instead submitting evidence that there is "no way to know" whether such damage had occurred. "No way to know" was fatal to their claim, as it was in analogous cases. (See, e.g., *Whittaker Corp. v. Allianz Underwriters, Inc.* (1992) 11 Cal.App.4th 1236, 1241–1244 [insured conceded that it was "impossible to determine" when damage happened, and thus could not meet burden of proving damage occurred "during the policy period"]; *Collin v. American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 807 [insureds conceded they "do not know what happened to their property," and thus could not meet burden of proving loss was caused by "accident" as required by policy].)[6]

---

[6] In a brief sentence in their opposition below, the Wongs argued that the Stillwater policy defines the term "property damage" to include "loss of tangible property." But the term "property damage" does not appear anywhere in Section I of the policy, which is the section that provides coverage for the insured's own property. Rather, the term "property damage" appears only in Section II of the policy, the section that provides coverage when a third-party makes a liability claim against an insured. Thus, the Wongs's assertion they sustained a "loss of use" of the embryos was irrelevant

The Wongs's opening brief does not address at all this aspect of Stillwater's motion, the Wongs's failure to demonstrate "direct physical loss." Stillwater argued this issue its respondent's brief. And in its reply brief the Wongs assert that if the trial judge had ruled for Stillwater on this point, it would have been an abuse of discretion—which, of course, is not the test.

But beyond that, the sum total of the Wongs's argument in their reply brief is a page-and-a-half passage under the heading that "The Eyvazzadeh declaration demonstrated the physical loss of the Wongs'[s] embryos," which is followed by this brief argument:

"Stillwater argues that a separate basis exists for supporting summary judgment, namely that the Eyvazzadeh declaration did not show that the Wongs had suffered physical loss to their embryos under the policy. This is a specious claim, and it was not embraced by the lower court.

"The only evidence in this case, from the Wongs's fertility physician, Dr. Eyvazzadeh, is that the Wongs's embryos were physically and crucially altered, whether the cell walls of the enclosed genetic material, rendering them 'worthless' to any prospective parents who undergo fertility treatment and embryo cryogenic storage for the express purpose of a healthy birth. . . . [¶] A determination of non-viability is as 'distinct, demonstrable [and] physical [an] alteration' as there can be to living tissue, 'causing it to become unsatisfactory for future use.' " (*MRI*, *supra*, 187 Cal.App.4th at p. 779.)[7]

---

to the property claim under Section I of the policy, which required that there be "physical loss" as distinguished from "property damage." (See *Warner v. Fire Ins. Exchange* (1991) 230 Cal.App.3d 1029, 1032 [insureds improperly failed to distinguish between first-party property coverage and third-party liability coverage].)

[7] Curiously, despite Dr. Eyvazzadeh's testimony about "no way to know," at another point in her declaration she indicates that perhaps there was a "way to know." That is, in paragraph 10 of her declaration Dr.

26

This does not support a direct "physical loss."

### *No Evidence of Any Specified Peril*

The Stillwater policy was, as noted, a "specified perils" policy. According to the leading California insurance commentary, the significance of this is the insured has "the threshold burden of proving the loss was caused by a *specifically-enumerated peril*." (Croskey, *supra*, Cal. Practice Guide: Insurance Litigation ¶ 6:253.2.) As our colleagues in Division One have described it, "in litigation, ' ". . . the burden is on the insured to prove that an event is a claim within the scope of the basic coverage." ' [Citation.] Only after 'the insured shows that an event falls within the scope of basic coverage under the policy' [citation] does the burden shift to the insurer to prove the claim is specifically excluded. [Citation.]" (*Central Nat. Ins. Co. v. Superior Court* (1992) 2 Cal.App.4th 926, 932–933; see generally CACI No. 2306, instructions for use: ["[F]or 'named perils' policies . . . the insured bears the burden of proving the loss was caused by the specified peril"].)

Here, as noted, the Wongs's position was that the loss was caused by an "explosion," in claimed support of which they relied on the excerpt from

---

Eyvazzadeh explained: "I have heard of others' experiences with embryos from Tank 4 that have been thawed from that tank and found to be no longer viable. I ordered a 'test' thaw of an abnormal embryo for at least three other patients—all of these embryos were dead. While I have heard of one viable embryo that had thawed, I have not heard of any resulting healthy live births: by contrast, I know of one stillbirth from one embryo that survived the thaw and was transferred. I asked PFC to do a test thaw of a euploid embryo belonging to the Wongs to see what I could observe, and they declined."

For reasons unexplained in the record, whatever might, or could, have been done on behalf of the Wongs was not done. And absent further expert testimony, it would be scientifically inappropriate to extrapolate anything pertinent to the Wongs' embryos from the fact that embryos "for at least three other patients . . . were dead."

27

Dr. Kasbekar's unsigned deposition in the Colorado lawsuit. The trial court ultimately ruled the excerpt inadmissible, and granted Stillwater's motion. This was correct. Before setting out the reasons why, we begin with some discussion of explosion, both in general and specifically as described in cases involving insurance.

Explosion is defined as "a violent expansion or bursting that is accompanied by noise and is caused by a sudden release of energy." (Webster's 3d New Internat. Dict. (1976).) As Dictionary.com defines it, ["[A]n act or instance of exploding; a violent expansion or bursting with noise, as of gunpowder or a boiler (opposed to implosion); [¶] [T]he noise itself: *The loud explosion woke them.* [¶] [A] violent outburst, as of laughter or anger; [¶] [A] sudden, rapid, or great increase: *a population explosion*; [¶] [T]he burning of the mixture of fuel and air in an internal-combustion engine"].) (Dictionary.com <https://www.dictionary.com/browse/explosion> [as of June 29, 2023].)

The California Encyclopedia describes it this way: "An 'explosion' has been defined as a sudden, accidental, violent bursting, breaking, or expansion caused by an internal force or pressure, which may be and usually is accompanied by some noise. Similarly, it has been said that a common characteristic of an explosion is the sudden breaking of a confined substance, with varying degrees of violence, from its confinement as a result of an internal pressure. It has also been characterized as a rapid, sudden, and violent expansion of air or relinquishment of energy, causing a rupture and accompanied by a loid noise, not necessarily extremely loud." (31 A Cal.Jur 3d Explosions and Explosures.)

Turning to insurance cases, "explosion" is "what ordinary men, not scientists," understand it to be. (*Roma Wine Co. v. Hardware Mut. Fire Ins.*

28

*Co.* (1939) 31 Cal.App.2d 455, 458.)  As the United States Supreme Court long ago put it, "When the word 'explosion' [is] used in the policy, [the parties] are presumed to have understood the word 'explosion' in its ordinary and popular sense.  Not what some scientific man would define to be an explosion, but what the ordinary man would understand to be meant by that word." (*Mitchell v. Potomac Insurance Co.* (1901) 183 U.S. 42, 52.)  As a leading insurance commentary puts it, an "explosion" is "commonly defined as a sudden and rapid combustion, causing a violent expansion of the air and accompanied by a report or sound, and is caused by a sudden release of energy from an escape of gas or vapors under pressure." (10A Couch on Insurance (3d ed. 2022) § 150.6.)

By contrast, there is what Dr. Kasbekar first mentioned in his exchange with counsel at his deposition—implosion.  Implosion is defined as "the act of imploding; a bursting inward (opposed to explosion)." (Dictionary.com <http://www.dictionary.com/browse/implosion> [as of June 29, 2023].)  "Implosion is a process in which objects are destroyed by collapsing (or being squeezed in) on themselves.  The opposite of explosion (which expands the volume), implosion reduces the volume occupied and concentrates matter and energy." (Wikipedia.com, The Free Encyclopedia <https://en.wikipedia.org/wiki/implosion_(mechanical_process)> [as of June 29, 2023].)

Against that background, what the Wongs put before the court here—some selected pages from the 185-page deposition of Dr. Kasbekar—was unavailing.  For reasons both substantive and procedural.

To begin with, there is nothing in the passage on which the Wongs rely that unequivocally demonstrates that Dr. Kasbekar had an opinion that explosion was the cause, especially when he began by reference to

29

"implosion." As he put it, "So my opinion really is I would call it an explosion of the vacuum space, but I think it's fair to also call it an implosion of the inner wall of the tank." He certainly did not testify to any "loud noise"—nor for that matter did anyone from Pacific Fertility, where any "loud noise" would certainly have been heard. In short, we question that the excerpt from Dr. Kasbekar's unsigned deposition in the Colorado case was worthy of consideration at all, especially in light of the significant gatekeeper function required of the trial court in handling issues of expert testimony.

For example, *Sargon* holds that a court may review not only the kind of material relied on by the expert but also whether the matter supports the expert's analysis. (*Sargon, supra*, 55 Cal.4th at pp. 771–772.) Here, we have to ask, whether there even was any "analysis." After all, after Dr. Kasbekar's implosion/explosion ambiguity and vacillation, it was the questioning attorney who said, "All right. Let's use the word 'explosion.'"

As our colleagues in Division Four recently confirmed, "Trial courts have a 'substantial "gatekeeping" responsibility' in excluding unreliable expert testimony. (*Sargon, supra*, 55 Cal.4th at p. 769.) This is to 'ensure that an expert's opinion is based on both reliable material and sound reasoning.' (*Bader v. Johnson & Johnson* (2022) 86 Cal.App.5th 1094, 1104.)" (*Onglyza Product Cases* (2023) 90 Cal.App.5th 776, 784 (*Onglyza*).) Again, we ask, where is the "sound reasoning?"

Other divisions in this District have affirmed summary judgments for defendants where the trial courts have excluded the proffered expert testimony. For example, there is *San Francisco Print Media Co. v. The Hearst Corp.* (2020) 44 Cal.App.5th 952, 961–962, where the court observed that "uninformed reliance on . . . analysis [was] not the mark of an opinion rooted in sound logic." Likewise, *Onglyza, supra*, 90 Cal.App.5th at

pages 784 to 785. As another District tersely put it, "expert opinion that does not contain 'a reasoned explanation illuminating why the facts have convinced the expert' need not be relied on." (*Taylor v. Trimble* (2017) 13 Cal.App.5th 934, 945, fn. 15.) Such descriptions aptly fit the Dr. Kasbekar material here.

Indeed, as Dr. Kasbekar put it some 53 pages later in his deposition, "you have that type of explosion, as we're calling it."[8] And as to "that type of explosion," it should be recalled how Dr. Kasbekar described it: "I really look at it more as if the vacuum space becomes a balloon and nitrogen gas expands within that vacuum space or balloon, you're exploding that vacuum space. The outside wall is more robust than the inside wall, so the damage occurs to the inside wall." Such "opinion" was not "explosion" as the insurance cases would have it, as understood by the ordinary man, not the scientist. (*Roma Wine Co. v. Hardware Mut Fire Ins. Co*, *supra*, 31 Cal.App.2d at p. 458.) That "opinion" was not one worthy of admission.

But even if the exchange between Dr. Kasbekar and counsel could pass muster as something that could raise a triable issue of material fact, it did not—because it was inadmissible.

By way of brief background, in its reply to the Wongs's opposition Stillwater objected to the Dr. Kasbekar material as hearsay and lacking

---

[8] The actual exchange at the deposition was this:

"Q. And is your theory and your assumption that there was a catastrophic vacuum loss in Tank 4, right?

"A. I wouldn't call it an assumption. You can call it a theory, but I think there's pretty good evidence that there was a sudden vacuum loss. I can't—and I've tried to envision another way that you have that type of explosion, as we're calling it, that results in that type of deformation of the tank."

foundation. The trial court sustained that objection. The Wongs do not take issue with that ruling, indeed admitting, as they put it in their reply brief, they "do not dispute that the Kasbekar deposition transcript itself is inadmissible as hearsay." Stillwater's reply did not object to the Dr. Kasbekar material on the grounds he was an undisclosed expert, as the date the Wongs had specified for designation of experts had not passed, so any such objection would have been premature. The Wongs assert that Stillwater objected on "a single basis: hearsay," and go on to assert that: "The court granted Stillwater's motion for summary judgment . . . on the basis of two objections Stillwater *had not made and had therefore waived*: i.e., (1) that Plaintiffs had failed to identify Kasbekar in an expert disclosure and that therefore his testimony was inadmissible at trial as hearsay . . . ." This is less than candid.

At the hearing, counsel for Stillwater stated that the Wongs "did not serve any deposition experts . . . [so] what we have now with this deposition testimony from another case is testimony from an . . . expert who can't testify." At that point the court interrupted, to "stop you there . . . because I agree with you and that's the *Perry* case." (*Perry*, *supra*, 2 Cal.5th 536.) Beyond that, the trial court expressly found that Stillwater "properly objected" to Dr. Kasbekar's testimony. And properly ruled it inadmissible.

It is undisputed that the Wongs served a demand for exchange of expert witness information; that Stillwater served a designation of experts; that the Wongs never served a designation of experts; and the Wongs never filed a motion seeking relief from their failure to do so. Where any party has served a demand for any exchange of expert witness information, any party who intends to designate as an expert must do so in the manner specified by Code of Civil Procedure section 2034.260. When the Wongs served their

32

demand, the Wongs themselves became obligated to serve either a designation of experts or a statement that they did not intend to offer any expert testimony. (Code Civ. Proc., § 2034.260 subds. (a) and (b).) They did not.

*Perry*, *supra*, 2 Cal.5th 536 is on point. There, plaintiff Perry sued a property owner and its tenant, claiming he was injured in a fall on the owners' property that the tenant leased. The owner moved for summary judgment, and in opposition plaintiff submitted the declarations of two experts opining that the stairs he fell on were in disrepair and did not comply with building code and industry standards. The trial court sustained the owner's objection to the declarations because plaintiff had failed to disclose the experts, and granted summary judgment for the owner.

The Court of Appeal affirmed. And the Supreme Court affirmed the Court of Appeal, holding that "when the court determines an expert opinion is inadmissible because disclosure requirements were not met, the opinion must be excluded from consideration at summary judgment if an objection is raised." (*Perry*, *supra*, 2 Cal.5th at p. 538.) As the leading practice treatise puts it: A party opposing a motion for summary judgment "may not use declarations of experts not previously disclosed if the time for disclosure under Code of Civil Procedure section 2034.210 et seq. has expired." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2023) ¶ 10:206.)

In an effort to avoid the consequences of their failure to designate Dr. Kasbekar, the Wongs argue they could have used Dr. Kasbekar as a percipient witness, because he examined Tank 4 at some point after its failure and could testify that it had been damaged by an "explosion." Such attempt to recharacterize Dr. Kasbekar as a percipient witness rings hollow

in light of the fact that the attorneys for the plaintiffs in the Colorado case hired Dr. Kasbekar to provide an expert opinion—not to mention that the Wongs themselves attempted to hire him.

But even if Dr. Kasbekar is characterized as a non-retained expert, the selected pages from his unsigned Colorado deposition would not meet the requirements of California summary judgment law. Specifically:

Code of Civil Procedure section 437c, subdivision (b)(2) provides that a party may oppose a motion for summary judgment with, among other things, "affidavits, declarations, [and] depositions . . . ." The excerpts from the Colorado deposition did not qualify as any of these under California law. The transcript of Dr. Kasbekar's testimony was not an "affidavit," which is defined as a "written declaration under oath, made without notice to the adverse party." (Code Civ. Proc., § 2003.) But, "*a transcript* of . . . testimony is not a 'written declaration under oath.'" (*Sweetwater*, *supra*, 6 Cal.5th at p. 942, original italics.) Moreover, the unsigned transcript was not a "declaration," because "a declaration must be signed and recite that the person making it certifies it to be true under penalty of perjury." (*Id.*, at p. 941.)

Finally, Dr. Kasbekar's Colorado deposition was not a "deposition" in the Wongs's case against Stillwater because Dr. Kasbekar's testimony was not taken after notice to Stillwater. Code of Civil Procedure section 2004 defines a "deposition" as "a written declaration, under oath, made upon notice to the adverse party, for the purpose of enabling him to attend and cross-examine." Similarly, Code of Civil Procedure section 2025.620 provides that "[a]t the trial or any other hearing in the action, any part or all of a deposition may be used against any party who was present or represented at the taking of the deposition, or who had due notice of the deposition . . . ." In

34

short, for purposes of making or opposing a motion under Code of Civil Procedure section 437c, a "deposition" can only mean a deposition taken after notice to the parties in the same action in which summary judgment is sought. The Colorado deposition was not that.

Lastly, in their reply brief the Wongs seek to salvage the inadmissibility of the Dr. Kasbekar material by asserting something they have never asserted before, which is this: "Second, the correct legal standard is not whether Kasbekar himself would be present at trial to introduce his deposition testimony so as to avoid exclusion of the deposition transcript as hearsay but rather whether it was 'reasonably possible that the facts asserted in [his deposition testimony] can be established by admissible evidence,' see *Sweetwater*, *supra*, 6 Cal.5th at p. 948, fn. 12—i.e., by anyone's competent testimony, expert or lay witness." An argument asserted for the first time in a reply brief will generally not be considered. (*Raceway Ford Cases* (2016) 2 Cal.5th 161, 178; *American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275–276.) In any event, *Sweetwater* hardly supports such a statement.

*Sweetwater* involved contractors who allegedly had obtained construction contracts by bribing school district employees and board members. Various persons testified before a grand jury, some of whom ultimately pled guilty or no contest to criminal charges. The pleas were in writing, were accompanied by detailed written narratives of the conduct, and were signed under penalty of perjury.

The school district then sued the contractors seeking to void the construction contracts and obtain disgorgement of funds previously paid the contractors. The contractors filed an anti-SLAPP motion, which the school district opposed, partly with excerpts of the grand jury testimony of some

witnesses and partly with the written pleas and written narratives that had been signed under penalty of perjury. The trial court overruled defendants' objections, and the Court of Appeal affirmed. So too the Supreme Court, which held that when ruling on an anti-SLAPP motion, the trial court "may consider statements that are the equivalent of affidavits and declarations because they were made under oath or penalty of perjury *in California*" and that the "plea forms, factual narratives, and the excerpts from the grand jury testimony satisfy this requirement." (*Sweetwater, supra*, 6 Cal.5th at p. 945.) This was in light of the court's observation that "[T]he important aspect of such evidence is that it be made *under penalty of California's perjury laws*." (*Id.*, at p. 943.)

The grand jury testimony at issue in *Sweetwater* satisfied this requirement because the testimony was taken in California and was subject to California's perjury laws, and for the additional reason that the documents contained express statements they were signed under penalty of perjury in California. This is not true of the Dr. Kasbekar material.

Indeed, we note that if we understand the Wongs's argument, it would mean that regardless of the hearsay, regardless of its source, a person opposing summary judgment could "testify" as to some hearsay and then search for something admissible to support it at trial. This cannot be the law.

Lastly, we note, as the Wongs conceded below and trial court held, that because their breach of contract cause of action had no merit, the other causes of action fail as well.

## DISPOSITION

The judgment is affirmed. Stillwater shall recover its costs on appeal.

36

_____
Richman, J.

We concur:

_____
Stewart, P.J.

_____
Markman, J. *

*Wong v. Stillwater Insurance Company* (A162893)

    *Superior Court of Alameda County, Judge Michael Markman, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | San Mateo County Superior Court |
| Trial Judge: | Honorable Nancy Fineman; |
| Attorney for Plaintiffs and Appellants, Sherlene Wong, Lawrence Wong: | Hershenson Rosenberg-Wohl, A Professional Corporation, David M. Rosenberg-Wohl |
| Attorney for Defendant and Respondent, Stillwater Insurance Company | Smith Smith & Feeley LLP, Stephen E. Smith; Phillip E. Smith. |